IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-786

No. COA22-13

Filed 6 December 2022

Onslow County, No. 19 JA 144

IN RE: M.C.

Appeal by Respondents from order entered 22 September 2021 by Judge Sarah
C. Seaton in Onslow County District Court. Heard in the Court of Appeals 20
September 2022.

> *Lauren Vaughan for petitioner-appellee Onslow County Department of Social*
> *Services.*
>
> *Peter Wood for respondent-appellant mother.*
>
> *J. Thomas Diepenbrock for respondent-appellant father.*
>
> *Administrative Office of the Courts, Guardian Ad Litem Program, by Appellate*
> *Counsel Matthew D. Wunsche, for guardian ad litem.*

MURPHY, Judge.

When reviewing a trial court's adjudication of a child as a "neglected juvenile,"
we determine whether clear and convincing evidence supports the challenged
findings such that they are binding on appeal. Here, we hold the challenged findings
are supported by clear and convincing evidence, though we also reiterate the principle
that an adjudication determines the status of the child, not the culpability of the
parents or others that may have created circumstances resulting in that status.

We affirm a neglect adjudication if it is supported by the trial court's findings

of fact. To support a neglect adjudication, we have required the findings show some physical, mental, or emotional impairment to the juvenile or a substantial risk of such impairment as a result of the failure to provide proper care, supervision, or discipline. A juvenile may not be adjudicated as neglected based solely on previous social services involvement relating to either parent's other children, as the findings must show other current circumstances presenting a risk to the juvenile, but it is relevant that a juvenile lives in a home where another child has been adjudicated as neglected. Additionally, a newborn need not be discharged from the hospital and allowed to return home before "neglect" can occur that supports a neglect adjudication.

Here, the findings show there were current circumstances, not limited to prior social services involvement with the parents' other children, that presented a substantial risk of impairment to the juvenile. These circumstances include the significant mental health and parenting capacity issues of each parent, failure of the parents to address their respective issues, and parents' inability to provide even the most basic care for the juvenile while in the hospital despite clearly communicated discharge expectations and repeated staff instruction. We therefore hold that the findings support the trial court's neglect adjudication. Accordingly, we affirm.

## BACKGROUND

¶ 4        Oscar,[1] the minor child that is the subject of this case, is the fourth child of Respondent Mother ("Mother"). Mother's three older children have been permanently removed from her care. Mother and Respondent Father ("Father") began seriously dating around 2013 and married around 2016. Mother has reported diagnoses of post-traumatic stress disorder, anxiety disorder, borderline personality disorder, seizures, and obsessive compulsive disorder. She completed a full psychological evaluation in August 2016 and was found to have significant cognitive limitation; the evaluator concluded that Mother should not be expected to parent independently.

¶ 5        Respondent Parents ("Parents") share two children. Their older child was adjudicated neglected in a Pitt County juvenile case by order filed 3 January 2019. On 17 September 2019, in connection with that case, Father underwent a psychological evaluation to assess his parenting capacity ("Parenting Capacity Evaluation"). The psychologist, Dr. Amy James, found Father met the criteria for unspecified personality disorder with turbulent, histrionic, and antisocial traits and recommended Father engage in weekly therapy with a cognitive behavioral therapist.

¶ 6        Mother prematurely gave birth to Oscar in the hospital on 1 November 2019. On 5 November 2019, the Onslow County Department of Social Services ("DSS") received a report that Oscar was born with significant respiratory issues because

---

[1] We use pseudonyms for all relevant persons throughout this opinion to protect the juvenile's identity and for ease of reading.

Mother had not managed her diabetes while pregnant. Oscar was treated with a continuous positive airway pressure ("CPAP") device and cared for in the newborn intensive care unit ("NICU").

¶ 7 Parents generally did not stay in the hospital with Oscar and instead stayed in a local hotel. Parents, however, slept in Oscar's hospital room at least one night during Oscar's time in the hospital. Parents were present when a doctor came to examine Oscar on 12 November 2019; the doctor observed Parents struggling to prepare Oscar's formula. Father then changed Oscar's diaper but failed to support Oscar's head, even after being instructed by the doctor. At around 6:18 p.m., a nurse's note stated that Parents had been struggling to prepare formula "since about [1:00 p.m.]" and that Mother "appear[ed] to [have an] issue changing diaper[s] independently." A half hour later, the nurse noted Father had left the hospital for about an hour and, "[w]hen he returned[,] his eyes were blood-shot, his speech was slurred, and he was unable to hold a coherent conversation with [the nurse or doctor]."

¶ 8 At 1:05 a.m. on 13 November 2019, a nurse entered Oscar's hospital room after hearing Oscar crying. Parents were not in the room, and Oscar was wearing an unbuttoned sleeper and lying in a crib that had multiple other items in it. While the nurse was in the room, Parents returned and struggled to change Oscar's diaper for several minutes. When Parents finished, they were informed the diaper was not

properly fastened. At 4:00 a.m., the nurse woke Father to tell him it had been four and a half hours since Oscar's last feeding, stressing the importance of keeping track of how much time passed between each feeding. At 8:25 a.m., the nurse woke Parents because it had been another four and a half hours since Oscar's last feeding. Parents left at 9:30 a.m. that morning, returning that night at 7:08 p.m. When the nurse asked if Parents were going to stay overnight, Father indicated they had already paid for a hotel room; the nurse "reiterated the importance of meeting NICU discharge expectations."

¶ 9        Also on 13 November 2019, a DSS employee, Tanesha Speller, went to the hospital, saw Oscar, and spoke with hospital staff. She was informed that Oscar was medically ready for discharge but Parents had not completed their discharge teaching; Parents were not present during DSS employee Speller's visit. Parents had planned to complete the discharge teaching when they stayed overnight the previous night but failed to do so.

¶ 10        At 3:54 a.m. on 14 November 2019, the nurse had to educate Parents on how to measure how much formula Oscar had consumed. The nurse helped Father swaddle Oscar and place him in a bassinet. Approximately 45 minutes later, the nurse entered the room because Oscar was crying. Oscar was lying in the bassinet with a soiled blanket draped over him and was visibly hungry. When Parents returned to the room about an hour later, the nurse reinforced safe sleep practices

and hunger cues.

That same morning, Father asked the nurse for help finding supplies for preparing a bottle of formula and changing linens. The nurse directed him to the supplies and reminded him he had been shown their location the past two days. Later that day, the nurse offered to complete a feeding to allow Parents to eat lunch; after the feeding, the nurse changed Oscar's diaper, outfit, and blankets that had been soiled with dried vomit.

On 14 November 2019, DSS filed a petition alleging Oscar was a neglected and dependent juvenile. DSS obtained a nonsecure custody order when it filed the petition. After holding an adjudication hearing on 24 and 25 May 2021, the trial court adjudicated Oscar a neglected juvenile by an *Amended Adjudication Order* entered 22 September 2021. Parents timely appealed.

## ANALYSIS

Father challenges four of the trial court's findings of fact, and Parents collectively make two arguments concerning the court's conclusions of law. We consider (A) Father's challenges to the findings and (B) Parents' arguments that the adjudication of Oscar as neglected was based solely on Parents' prior DSS history involving other children and that the findings do not demonstrate there was a substantial risk of harm to Oscar.

### A. Findings of Fact

¶ 14 Father argues that Findings 11, 13, 18, and 24 are not supported by clear and convincing evidence.

¶ 15 Under N.C.G.S. § 7B-805, "allegations in a petition alleging that a juvenile is abused, neglected, or dependent shall be proved by clear and convincing evidence." N.C.G.S. § 7B-805 (2021). Accordingly, "'[t]he role of this Court in reviewing a trial court's adjudication of neglect . . . is to determine [first] whether the findings of fact are supported by clear and convincing evidence . . . .'" *In re K.W.*, 2022-NCCOA-162, ¶ 10 (quoting *In re T.H.T.*, 185 N.C. App. 337, 343 (2007) (cleaned up in original), *aff'd in part, modified in part*, 362 N.C. 446 (2008)). "'The clear and convincing standard is greater than the preponderance of the evidence standard required in most civil cases.'" *Id.* (quoting *In re K.L.*, 272 N.C. App. 30, 36 (2020)). "'If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary.'" *Id.* (quoting *In re T.H.T.*, 185 N.C. App. at 563).

¶ 16 "Unchallenged findings of fact are deemed supported by the evidence and are binding on appeal." *In re K.H.*, 2022-NCCOA-3, at ¶ 13. We address the challenged findings below.

**1. Finding of Fact 11**

¶ 17 Finding 11 reads, "[Father] had to be shown where the infant's formula was kept and how to mix the infant's bottles numerous times. [Father] could not find the formula and would often forget where it was placed in the room." Father claims

Finding 11 is unsupported by clear and convincing evidence, as the Record shows only one time, 14 November 2019 at 4:13 a.m., that this occurred.

¶ 18        We disagree.  According to a hospital record[2] marked 12 November 2019 at 6:18 p.m., "[Mother] and [Father] have been preparing [Oscar's] milk since about [1:00 p.m.].  They have . . . needed prompting on how to use warmer multiple times, full education on warm[er] was provide[d] 3 times."  Then, on 14 November 2019, a hospital record noted in relevant part,

> [w]hile this [nurse] was in another [patient]'s room, [Father] approached H. Stine RT in the hallway for assistance with changing infant's linens and preparing a bottle. . . . This [nurse] reoriented [Father] to [Oscar's] room, reminding [Father] where items such as nipples, formula, and linens are located. . . . This [nurse] reminded [Father] that this [nurse] had oriented [Father] and [Mother] to [the] room including the location of supplies on [November 12] and [November 13].

Based on this evidence, we hold that clear and convincing evidence supports Finding 11 because hospital records indicate Father had to be shown where supplies were on three separate days and how to use the warmer three times.

**2. Finding of Fact 13**

¶ 19        Finding 13 reads, "[p]remature children need to be fed consistently and

---

[2] We do not address whether this hospital record or others were properly admitted during the adjudication hearing.  On appeal, Parents make no argument relating to their objection to the admission of the records during the hearing and the objection is deemed abandoned.  *See* N.C. R. App. P. 28(a) (2021).

[Parents] need to know how much to feed infants." Father claims Finding 13 is not rooted in Record evidence. The Record, however, shows hospital staff reminding Parents to feed Oscar frequently and Parents not knowing how much they had fed Oscar. On 12 November 2019, a doctor noticed Father leaning at a sink counter attempting to prepare formula and saying "how do you do this?" and "I see 30[ml], how do you tell the number?" Records from the next morning noted,

> [t]his [nurse] woke up [Father] at [4:00 a.m.] and explained that it was time for the infant to eat since it had been 4.5hrs since his last feeding. [Respondent Father] stated, "he wants to sleep just like us and if you would just leave him alone he'd be fine." This [nurse] reinforced to [Father] the importance of ensuring that he is mindful of the amount of time that has passed since infant has eaten last.

Later that morning, at 8:25 a.m., hospital records show that a nurse had to wake Parents to feed Oscar because it had been another four and a half hours since his last feeding. The next day, on 14 November 2019, Father asked a nurse to help him determine the volume of formula consumed by Oscar. The nurse taught Parents how to measure liquid volumes, but they struggled to quantify the feeding volume for the last feeding. On the same day, hospital records stated in relevant part,

> [Father] stated, "I will be so happy to leave this hospital because we'll be able to sleep and I won't have to worry about all this." This [nurse] reinforced teaching of newborn care and reminded [Father] that the same care would be required for [Oscar] at home. [Respondent Father] stated, "but at home we will be able to sleep more because we won't have to wake him up this much." This [nurse] reinforced

education regarding the importance of adequate nutritional intake.

Based on the foregoing, we hold that Finding 13 is supported by clear and convincing evidence.

**3. Finding of Fact 18**

¶ 20     Finding 18 reads,

> 18.     That [DSS employee], Tanesha Speller, testified at today's hearing and from that testimony, [t]he Court finds as follows:
>
>> a. On [5 November 2019], [DSS] received a report involving the family with concerns for the mental health, physical health, domestic violence, substantial child protective services history with both [Parents] and concerns for [Parents'] lack of ability to care for an infant.
>>
>> b. That [Parents] have an older child, who was in the custody and care of Pitt County Department of Social Services at the time of the filing of this petition.
>>
>> c. That at the time of this hearing, [Parents] do not have of their children in their care or custody.
>>
>> d. That [Father] told [DSS employee] Speller that [Mother] can care for herself and her children independently.
>>
>> e. That [DSS employee] Speller reviewed the findings of Dr. Amy James's report with [Father].
>>
>> f. That [Father] did not feel the results of his

assessment from Dr. James were correct, and that he should have another assessment, yet he has not received another assessment.

g. That [DSS employee] Speller visited with [Oscar] for over two hours in the hospital, and [Parents] were not with the child. That nurses had to perform the juvenile's feedings.

h. That on [12 November 2019], [Parents] stayed overnight to complete discharge teaching and to care for the baby themselves; however [Parents] slept in the room and did not participate in the baby's care, including feeding the baby.

i. That while in the hospital, [Parents] began to argue over whether the baby would be christened or baptized.

j. That on [14 November 2019], [Parents] wrote [Oscar] had consumed a total of 340 ml between the hours of 8:30 am and 1:30 pm. [Parents] also wrote that they changed [Oscar's] diaper four times during that time period.

k. That when the [nurse] changed [Oscar's] diaper at 2:00 p.m., the diaper was full of urine and stool, [Oscar's] outfit and blankets were soiled, and [Oscar] had not been changed recently, contrary to what [Parents] reported on the feeding log.

l. That [Parents] would often leave the hospital for long periods at a time, leaving [Oscar] unfed and dirty.

m. That [Mother] and [Father] had to be prompted repeatedly to feed, swaddle, and

change the baby.

> n. That on [13 November 2019], [Parents]
> would not spend the night in the hospital with
> [Oscar] because they already paid money for
> a hotel and stated they could[ ] [not] get sleep
> when they were in the hospital.

> o. That after being prompted by nursing staff
> to feed [Oscar] during the night, [Father]
> stated "[Oscar] wants to sleep just like us, and
> if you would just leave him alone, [he would]
> be fine".

> p. That after leaving [Oscar's] room for about
> an hour, [Father] returned to the room with
> blood-shot eyes, slurred speech, and was
> unable to hold a coherent conversation with
> the nurse or Doctor.

> q. That [Father] told [DSS employee] Speller
> that Pitt County DSS took his child . . .
> illegally and that Onslow County DSS was
> trying to take [Oscar] illegally as well.

Father claims Finding 18 is not supported by clear and convincing evidence on the

basis that it is "inaccurate" because paragraphs h-q were not based on DSS employee

Speller's testimony but rather appear to be based on medical records. Father

challenges no other portion of this finding. We do not agree with Father's

characterization of Finding 18.

¶ 21      Finding 18 summarizes the testimony of the DSS employee that caused the

petition to be filed. When questioned about Oscar's medical records[3] from the days after Oscar was born, DSS employee Speller testified that she had received and reviewed the records and that such records "contribute[d] to [her] decision to file a petition." The records were admitted over objection during Speller's direct examination, and neither Father nor Mother contend on appeal that the trial court improperly overruled the objection. As such, Finding 18 is correct to the extent it summarizes DSS employee Speller's testimony at the adjudication hearing, which was based in part on Speller's review of the records that Father argues are the source of the finding's substance. This is further confirmed by the fact that several of the medical records are summarized in findings of fact separate from Finding 18. For example, Findings 7 through 14 deal with the nursing and other hospital staff's concerns about the care that Parents were providing Oscar. Finding 18 is supported by clear and convincing evidence given DSS employee Speller's testimony.

**4. Finding of Fact 24**

¶ 22      Finding 24 reads, "[F]ather's failure to acknowledge responsibility for his neglect of his other juvenile in Pitt County shows a substantial risk of future neglect for [Oscar]." Father agues this finding is inaccurate, reflects a misapprehension of law, and is not supported by clear and convincing evidence. Father contends that the

---

[3] Such "medical records" included the hospital records written by staff, including nurses, that we discuss earlier in the opinion. *See supra* at ¶¶ 18-19.

trial court in the Pitt County case was not determining neglect or culpability on the part of either parent but rather the circumstances and status of the juvenile and that most of the findings in that adjudication order were related to Mother, not Father. Reviewing the Record, we conclude portions of Finding 24 are supported by clear and convincing evidence.

¶ 23        Father is correct that the Pitt County adjudication was about the status of Parents' other shared child as a neglected juvenile, not his or Mother's culpability. As our Supreme Court has explained,

> [w]here the evidence shows that a parent has failed or is unable to adequately provide for his child's physical and economic needs, whether it be by reason of mental infirmity or by reason of willful conduct on the part of the parent, and it appears that the parent will not or is not able to correct those inadequate conditions within a reasonable time, the court may appropriately conclude that the child is neglected. *In determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent.*

*In re Montgomery*, 311 N.C. 101, 109 (1984) (emphasis added). The Record, however, shows that Parents' other shared child was adjudicated as neglected in the Pitt County case but that Father has not acknowledged the facts found therein or the relevance of this adjudication in the case *sub judice*.

¶ 24        Parents were parties to the Pitt County case in which their other child was adjudicated as neglected, and their respective actions and inactions were described

in the findings of fact in that case's adjudication order. Additionally, DSS employee Speller's testimony before the trial court here reveals (1) Mother stated she "would be unable to parent independently," (2) Speller talked to Father when unable to reach Mother, (3) Father told Speller that Mother could parent independently and that "he believed Pitt County had made the report [about Oscar] and [] had taken his [other son with Mother] illegally," (4) the employee heard Mother in the background during the call with Father but "could[] [not] hear exactly what she was saying," and (5) Father later continued to question the legitimacy of the Pitt County case and suggest the case concerning Oscar was an effort by Pitt County. During that later conversation, in which Speller discussed the Parental Capacity Evaluation performed on Father pursuant to the Pitt County case, Father responded that he "feels he could have another assessment completed by -- that's not requested by Pitt County and one that can be unbiased." Father also "spoke about his case in Pitt County again, that they had never given him a case plan[,]" and that he "was[] [not] aware of recommendations." Clear and convincing evidence supports portions of Finding 24 because the Record shows Father failed to acknowledge the legitimacy of the Pitt County adjudication, an order by which he was bound as a party, and Father's lack of acknowledgement of a recent neglect adjudication regarding the only other child that Father shares with Mother created questions about the risk of impairment to Oscar.

¶ 25        Furthermore, as neglect adjudications are about the status of the child rather than the culpability of either parent, it is irrelevant that most of the findings in the Pitt County adjudication order refer to Mother because that adjudication was about Parents' *shared* child being neglected rather than Father or Mother's culpability. The Pitt County trial court did not enter separate adjudications of neglect based on the individual conduct of Mother and Father, nor would it be appropriate to do so. The Pitt County adjudication was about Parents' older *shared* child being neglected, and the adjudication before us here is about Parents' younger *shared* child being neglected. As such, we are not persuaded by Father's argument that the Pitt County adjudication is not relevant due to most of its findings referring to Mother because the underlying facts found therein should be viewed as explaining the status of Parents' other child, not Mother or Father's culpability in creating circumstances resulting in that status.

¶ 26        Finally, assuming *arguendo* that Finding 24 is unsupported by clear and convincing evidence, because we hold the findings nevertheless support the trial court's conclusion that Oscar is a neglected juvenile, the supposed lack of any particular fact regarding Father's culpability is immaterial at the adjudication stage. *See In re A.L.T.*, 241 N.C. App. 443, 451 (2015) (citation omitted) ("Because we rule the trial court's findings of fact support its conclusions of law that the juveniles were neglected, the lack of findings in the adjudication order regarding [the] [m]other's

fault or culpability in contributing to the adjudication of neglect is immaterial."). A trial court need not make a specific finding about the substantial risk of impairment resulting from the failure to provide proper care where the findings demonstrate that such a risk exists. *See In re A.D.*, 2021-NCCOA-398, at ¶ 19. As explained *infra*, the adjudication was supported by other findings that regard separate, then-existing circumstances presenting a substantial risk of impairment to Oscar. *See In re J.A.M.*, 372 N.C. 1, 10 (2019) ("[T]he prior orders entered into the record were not the sole basis for the trial court's decision. Rather, the trial court also properly found 'the presence of other factors' indicating a present risk to J.A.M. when it reached its conclusion that J.A.M. was neglected as a matter of law."). Finding 24, even if erroneous, does not constitute reversible error given the ample other findings supporting the adjudication. *See In re T.M.*, 180 N.C. App. 539, 547 (2006).

## B. Neglect Adjudication

¶ 27    Under N.C.G.S. § 7B-101(15), a "neglected juvenile" is

> [a]ny juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker does any of the following:
>
> a. Does not provide proper care, supervision, or discipline.
>
> b. Has abandoned the juvenile.
>
> c. Has not provided or arranged for the provision of necessary medical or remedial care.
>
> . . . .

> e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.
>
> . . . .
>
> In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C.G.S. § 7B-101(15) (2021). Here, the trial court made three conclusions of law in its order adjudicating Oscar as a neglected juvenile:

> 1. That the Court has jurisdiction over the parties and subject matter.
>
> 2. [Oscar] does not receive proper care or supervision from [Parents], and therefore is neglected within the meaning of N.C.G.S. § 7B-101(15), and that the same has been proven by clear, cogent, and convincing evidence.
>
> 3. A return of [Oscar] to the home of [Parents] at this time would be contrary to the best interests of the juvenile.

In challenging these conclusions, Parents argue the trial court erred in adjudicating Oscar as neglected when there was no harm to Oscar at the hospital. They claim the evidence failed to show even a risk of harm. They also contend the trial court erroneously adjudicated Oscar as a neglected juvenile based on their prior DSS history with other children because "[a] court may not adjudicate a juvenile neglected solely based upon previous [DSS] involvement relating to other children[,]" and, "in concluding that a juvenile 'lives in an environment injurious to the juvenile's welfare,'

. . . the clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile." *In re J.A.M.*, 372 N.C. 1, 9 (2019) (quoting N.C.G.S. § 7B-101(15) (2021)). As we explain below, such arguments are unavailing.

¶ 28 As we have concluded that the trial court's findings are supported by clear and convincing evidence, we must "determine . . . whether the legal conclusions are supported by the findings . . . ." *In re K.W.*, 2022-NCCOA-162, ¶ 10 (citation and marks omitted). The determination that a child is neglected is a conclusion of law subject to *de novo* review. *In re J.R.*, 243 N.C. App. 309, 312-13 (2015). "Under a *de novo* review, [we] 'consider[] the matter anew and freely substitute [our] own judgment for that of the lower tribunal.'" *In re K.W.*, 2022-NCCOA-162, at ¶ 11 (quoting *In re A.K.D.*, 227 N.C. App. 58, 60 (2013)).

¶ 29 For neglect adjudications based on N.C.G.S. § 7B-101(15)(a), as here, we have "'required that there be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide proper care, supervision, or discipline . . . .'" *In re G.C.*, 2022-NCCOA-452, ¶ 15 (quoting *In re Helms*, 127 N.C. App. 505, 511 (1997) (citation and marks omitted) (emphasis in original)); *see also* N.C.G.S. § 7B-101(15)(a) (2021). "[H]owever, there is no requirement that the court make a specific finding where the facts support a finding of harm or substantial risk of harm." *In re A.D.*, 2021-NCCOA-398, ¶ 19 (citing *In re Safriet*, 112 N.C. App. 747, 753 (1993)). "'[A] prior and closed case with

other children . . . cannot support an adjudication of current or future neglect.'" *In re G.C.*, 2022-NCCOA-452, at ¶ 15 (quoting *In re J.A.M.*, 372 N.C. at 9 (citation and marks omitted)). "Instead, we require[ ] the presence of other factors to suggest that the neglect . . . will be repeated." *Id.* (citation and marks omitted). "The trial court is granted 'some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside.'" *In re A.D.*, 2021-NCCOA-398, at ¶ 19 (quoting *In re C.M.*, 183 N.C. App. 207, 210 (2007) (internal citation and marks omitted)).

¶ 30          We have previously affirmed a neglect adjudication of a newborn child who was in the hospital when the petition was filed. *See In re A.B.*, 179 N.C. App. 605, 611 (2006). We found the trial court correctly "consider[ed] the substantial risk of impairment to the remaining children when one child in a home has been subjected to abuse or neglect." *Id.* We explained, "to hold that a newborn child must be physically placed in the home where another child was abused or neglected would subject the newborn to substantial risk, contrary to the purposes of [N.C.G.S. § 7B-101(15),]" and we held that "a newborn still physically in residence in the hospital may properly be determined to 'live' in the home of his or her parents for the purposes of considering . . . whether a substantial risk of impairment exists to that child." *Id.* Accordingly, here, we reject any contention from Parents that the trial court must wait for Oscar to be discharged from the hospital and returned home before it may

adjudicate Oscar neglected.

Next, while a neglect adjudication may not be based solely on previous DSS involvement relating to other children, the General Assembly directed that such involvement is "relevant" in determining whether a child is a neglected juvenile: "In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C.G.S. § 7B-101(15) (2021). Here, DSS involvement with Parents' other children was the subject of only a few of the abundant unchallenged findings that support a substantial risk of impairment to Oscar based on the circumstances surrounding him at the hospital and on the potential for future neglect if returned home:

> 7.    That over the thirteen days that [Mother] and [Father] were in the NICU with [Oscar], the nursing staff became concerned with [Parents'] behavior.
>
> 8.    That [Parents] were leaving the child alone in his bassinet, [Oscar] was not properly swaddled, and [Parents] put items in [Oscar's] bassinet that could interfere with safe sleeping, such as stuffed animals.
>
> 9.    That on more than one occasion, the nurse assigned to the room came in to find the infant crying, [Mother] and [Father] were not present, and [Oscar] was left unattended.
>
> 10.    That [Parents] had to be assisted in changing the infant's diaper on numerous occasions.
>
> . . . .

12. That [Father] was not able to measure the appropriate amounts of formula [Oscar] was fed.

. . . .

14. That during [Oscar's] thirteen day stay at the hospital, the nurses and medical staff[ ] continued to have concerns because [Parents] could not take proper care of [Oscar].

15. That Dr. Amy James was qualified as an expert in Forensic Psychology, and from her testimony, [t]he Court finds as follows:

> a. A Parental Capacity Evaluation was performed on [Father] on [16 September 2019], pursuant to an on-going CPS case in Pitt County.
>
> b. Dr. James opined that it is improbable that [Father] is capable of sole caregiving to his child as he is in need of stable employment, individual and couple's therapy.
>
> c. That [Father] is in need of stable employment because his prior history of unstable employment has led to housing instability.
>
> d. That [Father] struggled with accurate dates and times during his historical timeline of his life.
>
> e. That [Father] has five other children.
>
> f. That [Father] has not parented any of his other children to adulthood.
>
> g. That Dr. James identified individual therapy as a need for [Father's] ability to parent.

h. That [Father's] behaviors impair his ability to assist [Mother] in parenting.

i. That [Father] would need to be meaningfully engaged in therapy for at least 90 to 180 days to show any significant progress in his behaviors.

j. That [Father's] past behaviors show an impairment in his ability to empathize, ability to communicate, lack of self-awareness, and his interactions with others.

k. That this impairment of his behaviors are what led to his diagnosis of Unspecified Personality Disorder with significant Turbulent, Histrionic, and Antisocial Traits.

l. That if [Father] addresses his risk factors, he could independently parent, however [Father] does not recognized or acknowledge any issues, and has not received any treatment.

16. That Dr. James[ ] made her report in September of 2019, and [Oscar] was born less than two months later in November of 2019. That the report is relevant as to this child, due to the closeness in time of the report and [Oscar's] birth.

17. That as of the date of this hearing, [Father] has not participated in individual therapy.

. . . .

19. That [Mother] has had three previous children, two of which the Maternal Grandfather is the father of the children. All three children have been removed from her custody.

20. [Mother's] Parental Rights to [Oscar's] half siblings

were terminated on [24 May 2018].

21.     [Parents] have an older child that was adjudicated neglected in Pitt County on [11 October 2018].

22.     That pursuant to Petitioner's Exhibit #5, [Mother] was court ordered to participate in mental health treatment, demonstrate skills learned in parenting class, maintain sufficient and stanch housing, maintain communication with the Department and sign any releases as requested.

23.     That [Mother] has not completed any of the Court ordered recommendations from Petitioner's Exhibit #5.

. . . .

25.     That [Mother] is diagnosed with Post-Traumatic Stress Disorder, Anxiety Disorder, Borderline Personality Disorder, seizures, and Obsessive-Compulsive Disorder. That [Mother] does not take any medications for these conditions, does not seek any on-going mental health treatment for these conditions, and struggles with mental instability and cognitive delays.

26.     That [Mother] has been found to not have the capacity to independently parent pursuant to a prior parental capacity evaluation in 2016.

27.     That based upon the above findings of fact, the Court hereby finds [Oscar] to be [a] neglected juvenile in that [Oscar] does not receive proper care or supervision from [Parents].

The trial court's adjudication of Oscar as neglected was based on several facts that did not involve Parents' DSS involvement regarding their other children, including Parents' actions in the hospital in the days following Oscar's birth, Parents' respective

failures to undergo therapy and other treatment for conditions that have been found to impair their individual parenting capacities, and Father's lack of acknowledgment of the concerns raised by Dr. James and DSS employee Speller. These unchallenged findings show a substantial risk of physical, mental, and emotional impairment to Oscar from Parents' failure to provide proper care for Oscar while he was in the hospital because Oscar missed feedings, was not fed enough at times even when hospital staff repeatedly showed Parents how to mix his formula, was left alone with a soiled blanket draped over him, and was put down for bed in violation of safe sleeping practices that were explained to Parents multiple times. Even with instruction and assistance from hospital staff, Parents were not providing proper care and supervision for Oscar, and neither the binding findings nor anything in the Record suggest Parents' care would suddenly be proper outside the hospital and would not result in physical, mental, or emotional impairment to Oscar.

¶ 32        Furthermore, such findings also show a substantial risk of physical, mental, and emotional impairment to Oscar because they reveal Parents have failed to make the changes necessary for at least one of them to provide proper care for Oscar. *See In re A.D.*, 2021-NCCOA-398, at ¶¶ 20-23 (finding substantial risk of impairment from the respondent-mother's failure to complete required therapy and make changes recommended by DHHS, in addition to the respondent-mother's use of improper discipline on her children); *In re J.A.M.*, 372 N.C. at 10-11 (finding substantial risk

of impairment based in part on the respondent-mother's failure to "develop[] the necessary skills" for avoiding placing child in a dangerous living situation). Mother has not made progress on any of the recommendations ordered in the Pitt County case, and she continues to not take medication or receive other treatment for her diagnosed mental health conditions. While Father's recommendations were not court-ordered, they are found in Dr. James's report that unchallenged Finding 16 refers to as "relevant" due to the "closeness in time of the report and [Oscar's] birth," and Father has made no progress implementing the suggested changes and instead has characterized the report as biased. Yet Father has not received another assessment.

¶ 33    We therefore hold that the trial court's conclusions of law adjudicating Oscar as neglected were supported by the findings. The unchallenged findings are sufficient for us to reach this conclusion. Additionally, the challenged findings that we hold are supported by clear and convincing evidence, which involve additional facts of the care and supervision Parents provided in the hospital and of DSS employee Speller's understanding of the records she reviewed, support adjudicating Oscar as neglected. We, however, make clear that our decision is based on the status of Oscar, not Mother or Father's alleged culpability in creating the circumstances surrounding him.

## CONCLUSION

¶ 34    As the findings support the existence of a substantial risk of physical, mental,

or emotional impairment to Oscar resulting from Parents' failure to provide proper care, the trial court did not err in adjudicating Oscar as a neglected juvenile.

AFFIRMED.

Chief Judge STROUD and Judge ZACHARY concur.