IN THE SUPREME COURT OF NORTH CAROLINA

No. 7PA17-2

Filed 1 February 2019

IN THE MATTER OF:  J.A.M.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 816 S.E.2d 901 (2018), on remand from this Court, 370 N.C. 464, 809 S.E.2d 579 (2018), affirming an order entered on 30 March 2016 by Judge Louis A. Trosch in District Court, Mecklenburg County.  Heard in the Supreme Court on 9 January 2019.

*Matthew D. Wunsche, GAL Appellate Counsel, and Caroline P. Mackie for appellee Guardian ad Litem; and Marc S. Gentile, Associate County Attorney, for petitioner-appellee Mecklenburg County Department of Social Services, Youth and Family Services.*

*Richard Croutharmel for respondent-appellant mother.*

HUDSON, Justice.

The case comes to us based on a dissenting opinion in the Court of Appeals. The sole issue before us is whether the Court of Appeals majority correctly determined that the clear and convincing evidence and the trial court's findings of fact supported its conclusion of law that the juvenile J.A.M. was neglected.  Because we conclude that the trial court made sufficient findings of fact based on evidence of conditions at the relevant time to support its conclusion of neglect, we affirm.

Background

J.A.M. was born in January 2016. In late February 2016, Mecklenburg County Department of Social Services, Youth and Family Services (YFS) received a child protective services report making the department aware of J.A.M.'s birth, and YFS immediately opened an investigation. On 29 February, YFS filed a juvenile petition alleging that J.A.M. was not safe in the home because of the histories of both parents.[1]

On 30 March 2016, a hearing regarding J.A.M. took place before Mecklenburg County District Court Judge Louis A. Trosch, who entered a consolidated adjudicatory and dispositional order in J.A.M.'s case based on testimony and exhibits admitted as evidence to the court. The court adjudicated J.A.M. neglected and, in the dispositional phase of the proceeding, ordered reunification efforts with J.A.M.'s mother (respondent-mother) to cease and established that the primary plan of care for J.A.M. would be reunification with her father (respondent-father).[2]

Respondent-mother has a significant history of involvement with YFS extending back to 2007 relating to children born prior to J.A.M.[3] Significant evidence relating to YFS' previous interactions with respondent-mother involving her older children was entered into the record in the adjudication phase of J.A.M.'s case. The evidence before the trial court tended to show that respondent-mother has a long history of violent relationships with the fathers of her previous six children, during

---

[1] Respondent-father is not a party to this appeal.

[2] Only the neglect adjudication—and not the dispositional order—is before us.

[3] J.A.M.'s father is not the father of any of respondent-mother's older children.

which her children "not only witnessed domestic violence, but were caught in the middle of physical altercations." Furthermore, during this period, she repeatedly declined services from YFS and "continued to deny, minimize and avoid talking about incidences of violence." All of this resulted in her three oldest children first entering the custody of YFS on 24 February 2010.

The most serious incident occurred in June 2012 when respondent-mother was in a relationship with E.G. Sr., the father of her child E.G. Jr., a relationship that—like prior relationships between respondent-mother and other men—had a component of domestic violence. Respondent-mother had recently represented to the court that "her relationship with [E.G. Sr.] was over" and stated that she "realized that the relationship with [E.G. Sr.] was bad for her children"; however, she quickly invited E.G. Sr. back into her home. Following another domestic violence incident between respondent-mother and E.G. Sr., E.G. Jr. "was placed in an incredibly unsafe situation sleeping on the sofa with [E.G. Sr.]" for the night, which resulted in E.G. Jr. suffering severe, life-threatening injuries, including multiple skull fractures, at the hands of E.G. Sr. The next morning, respondent-mother "observed [E.G. Jr.'s] swollen head, his failure to respond, [and] his failure to open his eyes or move his limbs," but she did not dial 911 for over two hours. Following this incident, respondent-mother's children re-entered the custody of YFS. Afterwards, she refused to acknowledge E.G. Jr.'s "significant special needs" that resulted from his injuries, maintaining that "there [was] nothing wrong with him" and "stat[ing] that he [did] not need all the

services that [were] being recommended for him." Respondent-mother proceeded to have another child with E.G. Sr. when he was out on bond for charges of felony child abuse.

In response to respondent-mother's failure to protect E.G. Jr., as well as her other children, her parental rights to the six children she had at the time were terminated in an order filed on 21 April 2014 by Judge Trosch. The 2014 termination order was based largely on the court's finding that she had "not taken any steps to change the pattern of domestic violence and lack of stability for the children since 2007."

At the 30 March 2016 adjudication hearing for J.A.M., the court received into evidence several exhibits that included the 21 April 2014 order terminating respondent-mother's parental rights to her six older children, a 27 February 2013 adjudication and disposition order regarding five of those children, and a certified copy of the criminal record of respondent-father showing that he had been convicted twice in 2013 for assault on a female.[4]

In addition to receiving these exhibits into the record, the court also heard testimony from several witnesses. Stephanie West, social work supervisor at Mecklenburg County Child Protective Services, testified that when the department

---

[4] The court also received into evidence an 8 October 2012 order adjudicating neglected and abused another daughter of respondent-father that he had with a different woman. That order states that respondent-father's older daughter, then aged nine months, received a black eye while under her parents' care, "most likely during a DV incident" between them.

received the report regarding J.A.M., a social worker was assigned to go to the home and perform a safety assessment in light of both parents' prior YFS involvement. Both parents declined to sign the safety assessment. A department representative returned the following day to talk with respondent-mother about setting up a Child Family Team meeting, but she "adamantly stated she was not interested." Ms. West further discussed respondent-mother's viewpoint at the second visit.

> Q.   And when she said she was not interested, not interested in what?
>
> A.   More services. She was not going to engage in any services. She reported that she had gone through services, she didn't need any services, there were [sic] no current domestic violence going on, and she was -- and that was pretty-much [sic] all she had to say.

Respondent-mother also testified at the hearing and was asked questions on two subjects pertinent to this appeal: (1) her familiarity with respondent-father's domestic violence history, and (2) her understanding of what had led to the termination of her parental rights to her older children.

Respondent-mother stated that she knew the "warning signs" of domestic violence to look for in a relationship. However, she subsequently testified that she was aware that respondent-father had been arrested for assault on a female in a case involving his sister but acknowledged that she had never asked him whether he did, in fact, commit the assault.

Similarly, when asked what she learned from having her parental rights terminated to her six older children, respondent-mother generally admitted to "bad decisions" and "bad choices" in the past, noting that she had since "learned to put my children first, before men."

Nonetheless, respondent-mother subsequently testified further about her prior YFS case:

> Q.    Why were your rights terminated?
>
> A.    Because when my child came back into -- my kids came back into custody, due to my child being physical injury by his father, [E.G. Sr]. That's --
>
> Q.    So your understanding is that your rights to your six other children was -- were terminated because of one child being physically abused?
>
> A.    Oh, yes, ma'am. . . . because I had completed all my services and did everything that was asked of me to do, up until my child got hurt by his father.

Regarding her role in that abuse, respondent-mother testified:

> Q.    And what role do you think you played in your child getting hurt by that father?
>
> A.    I was upstairs sleeping.
>
> Q.    Okay.
>
> A.    I didn't have -- I didn't have a role into what my child being hurt. I didn't play a role in that.
>
> Q.    And so basically, do you feel that your rights to the six other children, your rights were unjustly terminated?

A.     Yes, ma'am.  I do feel that way.

After reviewing the exhibits and hearing the testimony, the trial court

concluded that J.A.M. was neglected because:

> Juv[enile] resides in an environment in which both parents have a [history] of domestic violence/assault and each parent had a child enter [YFS] custody that was deemed abused while in the care of each parent. All of juveniles' siblings were adjudicated neglected. *No evidence the parents have remedied the injurious environment they created for their other children.*

(Emphasis added.)  In support of its conclusion, the trial court made the

following additional findings of fact:

> Clear and convincing evidence juv[enile] is neglected.  [Respondent-mother]'s testimony was telling today.  Additionally, parents failed to make any substantive progress in their prior cases which resulted in [termination of parental rights] for [respondent-mother] and [Father]'s child was placed in the custody of that child's mother.  [Department] attempted to engage parents when it received a referral and both parents declined to work [with Department] and reported not needing any services.  [Respondent-mother] testified.  [Maternal grandmother] and [Social Work Supervisor] West all testified.  Previously [respondent-mother]'s children were returned to her care and ended up back in [YFS'] custody due to the abuse of one of the juveniles and it appeared [respondent-mother] was not demonstrating skills learned [from] service providers.  [Father] did not dispute allegations in the petition. [Respondent-mother] has a [history] of dating violent men and [Father] in this case has been found guilty at least twice for assault on a female. [Respondent-mother] acknowledged being aware [Father] had been charged [with] assaulting his sister but [respondent-mother] said she never asked [Father] if he assaulted his sister despite testifying about the "red flags" she learned in DV servs.  [Respondent-mother] testified to having a child [with] the man who abused one of her kids. [Department] received a total of 12 referrals regarding the [respondent-mother] and at least 11 referrals pertained to domestic violence.  [Court] took into consideration all the exhibits (1-4) submitted by YFS when making its decision.  To date, [respondent-mother] failed to acknowledge her role in the [juveniles'] entering custody and her rights subsequently

being terminated.

Respondent-mother appealed Judge Trosch's 30 March 2016 order adjudicating J.A.M. a neglected juvenile to the Court of Appeals, which issued a unanimous decision on 20 December 2016 reversing the trial court's neglect adjudication. *See In re J.A.M.*, ___ N.C. App. ___, 795 S.E.2d 262 (2016). The Court of Appeals held that

> [d]ue to the intervening years between the prior cases and the facts before us, we conclude the parents' past histories, coupled only with Respondent-mother's failure to inquire about an alleged incident of prior domestic violence by J.A.M.'s father, do not support a legal conclusion that J.A.M. is a neglected juvenile. No evidence supports the trial court's findings of fact. The findings do not support its conclusion that J.A.M. is a neglected juvenile because she lives in an environment injurious to her welfare.

*Id.* at ___, 795 S.E.2d at 266 (citation omitted). YFS filed a petition for discretionary review with this Court, which we allowed on 8 June 2017. *See In re J.A.M.*, 369 N.C. 750, 799 S.E.2d 617 (2017). We heard argument on the case on 9 January 2018 and filed a per curiam opinion on 2 March 2018, *In re J.A.M.*, 370 N.C. 464, 809 S.E.2d 579 (2018) (*J.A.M. I*). In *J.A.M. I*, we held that the Court of Appeals had misapplied the standard of review and stated that "the trial court's finding was 'supported by clear and convincing competent evidence' and is therefore 'deemed conclusive.' " *Id.* at 466, 809 S.E.2d at 581 (citing *In re N.G.*, 186 N.C. App. 1, 4, 650 S.E.2d 45, 47 (2007), *aff'd per curiam*, 362 N.C. 229, 657 S.E.2d 355 (2008)). We reversed the Court

of Appeals decision and remanded the case to that court for reconsideration and proper application of the standard of review. *Id.* at 467, 809 S.E.2d at 581.

On remand, the Court of Appeals issued another opinion on 5 June 2018, relying on the guidance we provided in *J.A.M. I.* In its new opinion, a majority of the panel affirmed the trial court's neglect adjudication, concluding that "[t]he cumulative weight of the trial court's findings [is] sufficient to support an adjudication of neglect, and our Court may not reweigh the underlying evidence on appeal." *In re J.A.M.*, ___ N.C. App. ___, ___, 816 S.E.2d 901, 905 (2018). The panel's majority noted that the trial court's findings that respondent-mother

> (1) continued to fail to acknowledge her role in her rights being terminated to her six other children, (2) denied the need for any services for J.A.M.'s case, and (3) became involved with the father, who [had] engaged in domestic violence . . . even though domestic violence was one of the reasons her children were removed from her home, constitute evidence that the trial court could find was predictive of future neglect.

*Id.* at ___, 816 S.E.2d at 905 (citing *In re N.G.*, 186 N.C. App. At 9-10, 650 S.E.2d at 51). The Court of Appeals dissent maintained that the evidence in the trial record was entirely inadequate to support the court's neglect adjudication. In the dissenter's opinion, "the trial court's order contains no findings of fact [ ] which are supported by any evidence, and certainly not 'clear and convincing competent evidence,' that J.A.M. is presently at substantial risk of neglect by Respondent-mother." *Id.* at ___, 816 S.E.2d at 907 (Tyson, J., dissenting). On 27 June 2018, respondent-mother entered her notice of appeal based on the dissenting opinion. The parties briefed the issue of

whether the competent evidence and the trial court's findings of fact supported its conclusion of law that J.A.M. was neglected. We heard argument for the second time on 9 January 2019.

Analysis

The North Carolina General Statutes set out the grounds upon which a juvenile can be adjudicated "neglected":

> Any juvenile less than 18 years of age (i) who is found to be a minor victim of human trafficking under G.S. 14-43.15 or (ii) whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; *or who lives in an environment injurious to the juvenile's welfare*; or the custody of whom has been unlawfully transferred under G.S. 14-321.2; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect *or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.*

N.C.G.S. § 7B-101(15) (Supp. 2018) (emphases added). In addition, allegations of neglect must be proved by clear and convincing evidence. *Id.* § 7B-805 (2017).

As we stated in *J.A.M. I*,

> [i]t is well settled that "[i]n a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." *In re N.G.*, 186 N.C. App. 1, 4, 650 S.E.2d 45, 47 (2007) (quoting *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997)), *aff'd per curiam*, 362 N.C. 229, 657 S.E.2d 355 (2008); *see also In re Montgomery*, 311 N.C. 101, 110-11, 316 S.E.2d 246, 252-53 (1984) ("Although the question of the *sufficiency* of the evidence to support the findings may be raised on appeal, our appellate courts are bound by the

trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." (citations omitted)).

370 N.C. at 464-65, 809 S.E.2d at 580. A court may not adjudicate a juvenile neglected solely based upon previous Department of Social Services involvement relating to other children. Rather, in concluding that a juvenile "lives in an environment injurious to the juvenile's welfare," N.C.G.S. § 7B-101(15), the clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile. The trial court's findings here did so and thus support the trial court's conclusion of law.

The neglect statute "neither dictates how much weight should be given to a prior neglect adjudication, nor suggests that a prior adjudication is determinative." *In re A.K.*, 360 N.C. 449, 456, 628 S.E.2d 753, 757 (2006) (citation omitted). "Rather, the statute affords the trial judge some discretion in determining the weight to be given such evidence." *In re Nicholson*, 114 N.C. App. 91, 94, 440 S.E.2d 852, 854 (1994).

"In order to adjudicate a juvenile neglected, our courts have additionally 'required that there be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide "proper care, supervision, or discipline." ' " *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (emphasis added) (quoting *In re Safriet*, 112 N.C.App. 747, 752, 436 S.E.2d 898, 901-02 (1993)). In neglect cases involving newborns, "the

decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999) (affirming the neglect adjudication of an infant based on the parents' failure to correct circumstances that led to the death of an older sibling before the infant was born).

The Court of Appeals dissenting opinion correctly notes that "[a] prior and closed case with other children . . . *standing alone*, cannot support an adjudication of current or future neglect." *In re J.A.M.*, ___ N.C. App. at ___, 816 S.E.2d at 908 (emphasis added); *see In re N.G.*, 186 N.C. App. at 9, 650 S.E.2d at 51 ("[T]he fact of prior abuse, standing alone, is not sufficient to support an adjudication of neglect."). Instead, we "require[ ] the presence of other factors to suggest that the neglect or abuse will be repeated." *In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 487, 489, *disc. rev. denied*, 367 N.C. 524, 762 S.E.2d 213 (2014) (citations omitted). Here, the prior orders entered into the record were not the sole basis for the trial court's decision. Rather, the trial court also properly found "the presence of other factors" indicating a present risk to J.A.M. when it reached its conclusion that J.A.M. was neglected as a matter of law.

The Court of Appeals majority identified three findings of fact, all supported by clear and convincing evidence and all of which support a conclusion that J.A.M.

presently faced substantial risk in her living environment. Specifically, the trial court found that respondent-mother

> (1) continued to fail to acknowledge her role in her rights being terminated to her six other children, (2) denied the need for any services for J.A.M.'s case, and (3) became involved with the father, who [had] engaged in domestic violence . . . even though domestic violence was one of the reasons her children were removed from her home . . . .

*In re J.A.M.*, ___ N.C. App. at ___, 816 S.E.2d at 905 (majority opinion).

All of these findings were supported by the testimony in the 30 March 2016 hearing. Social Work Supervisor West's unchallenged testimony provided the basis for the finding that respondent-mother had denied the need for services, and respondent-mother's own testimony furnished the basis for the other two findings. Respondent-mother testified that she knew that respondent-father had been charged with assault on a female but did not ask him whether this report was true. This testimony supports the court's finding that she was involved with respondent-father despite her awareness of his history of domestic violence. Respondent-mother also testified that she believed her parental rights to her six older children were terminated because of the actions of E.G. Sr. in seriously injuring E.G. Jr. and that she had no role in the harm that came to their child. This testimony supports the finding that she "fail[ed] to acknowledge her role in" the termination of her rights as to her six older children.

In turn, the trial court's findings of fact also support the court's conclusion of law that J.A.M. was a neglected juvenile, a child who was at risk in that there was

"[n]o evidence the parents ha[d] remedied the injurious environment they created for their other children." Combined with the lengthy record from her past cases, the findings that respondent-mother believed she did not need any services from YFS, had opted not to directly confront her romantic partner's prior domestic violence history, and continued to minimize the role her own prior decisions played in the harm her older children had suffered all support a conclusion that respondent-mother had not made sufficient progress in recognizing domestic violence warning signs, in accurately assessing poor decisions from the past, or in identifying helpful resources. It was proper for the trial court to then reach the conclusion that respondent-mother had not developed the skills necessary to avoid placing J.A.M. in a living situation in which she would suffer harm.

In making its three findings indicating that the present circumstances of J.A.M.'s living environment placed her at a substantial risk of harm, the trial court stated that respondent-mother's "testimony was telling today." While this description would be too vague to support any legal conclusion standing on its own, the statement is noteworthy because it indicates that the trial court made a credibility determination following the testimony and that the court's credibility judgment supported its factual finding that respondent-mother had failed to take responsibility for her role in the termination of her parental rights to her other children. Arguably, there was testimony in the record below that could have supported different factual findings and possibly, even a different conclusion. But an

important aspect of the trial court's role as finder of fact is assessing the demeanor and credibility of witnesses, often in light of inconsistencies or contradictory evidence. It is in part because the trial court is uniquely situated to make this credibility determination that appellate courts may not reweigh the underlying evidence presented at trial. This principle certainly applies in a case like this one, in which the same trial court judge had multiple opportunities over a period of time to see and hear the parties involved.

We conclude that the trial court's adjudication that J.A.M. was a neglected juvenile was based on findings of fact which were supported by competent evidence and included present risk factors in addition to an evaluation of past adjudications involving other children. Because the Court of Appeals majority properly applied the appropriate standard of review in affirming the trial court's order, we affirm the decision of the Court of Appeals.

AFFIRMED.