An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-1032

Filed 2 July 2025

Chatham County, Nos. 21 JT 000040-180, 21 JT 000041-180, 21 JT 000042-180, 21 JT 000043-180

IN THE MATTER OF A.G., A.G., A.G., A.G.

Appeal by Respondent-Appellant Mother from orders entered 14 August 2024 by Judge Samantha H. Cabe in Chatham County District Court. Heard in the Court of Appeals 11 June 2025.

> *Stephenson & Fleming, LLP, by Jane R. Thompson, for Petitioner-Appellee Chatham County Department of Social Services.*
>
> *Hooks Law, P.C., by Laura G. Hooks for Respondent-Appellant Mother.*
>
> *Administrative Office of the Courts, by Brittany T. McKinney, for guardian ad litem.*

GRIFFIN, Judge.

Respondent Mother appeals from the trial court's orders terminating her parental rights to her four children: Adara, Amie, Alana, and Ashur[1]. Mother argues the trial court erred by adjudicating the children dependent and that it abused its

---

[1] We use pseudonyms for ease of reading and to protect the children's identities. *See* N.C. R. App. P. 42(b).

discretion by concluding terminating Mother's parental rights was in the children's best interest. We disagree and affirm the trial court's orders.

## I. Factual and Procedural Background

Mother has four children; the oldest of whom was born testing positive for marijuana in 2019. This prompted a Chatham County Department of Social Services ("DSS") investigation in which DSS learned Mother struggled with managing her narcolepsy diagnosis. DSS closed the case without recommending services. Shortly after the birth of the oldest child, another report was made concerning the condition of the home in which Mother and her child resided; specifically referencing how Mother was venting a wood-burning stove. DSS closed the case without recommending services again.

In August 2020, during her pregnancy with the other three children, who are triplets, Mother tested positive for marijuana and cocaine. Two of the triplets also tested positive for marijuana at birth. DSS again received a report because of the test but ultimately closed the case without recommending services. One month later, DSS received another report concerning Mother's ability to care for the triplets, Mother's driving despite her narcolepsy diagnosis, Mother dropping the children because of her narcolepsy, and Mother admitting marijuana use. DSS instituted ongoing case management services in October 2020.

While administering case management services, DSS received two more

reports; one about Mother and the children living in a condemned home and another about Mother improperly disciplining her niece by slapping her in the face and leaving a mark. DSS later ceased involvement with Mother and her family in June 2021 after addressing her lack of compliance in taking her narcolepsy medication and her substance abuse issues. DSS specifically discussed with Mother the dangers her narcolepsy diagnosis would create when driving with the children.

On 8 August 2021, after DSS received a report of Mother and Amie being involved in a single-car accident in which the car caught fire, DSS filed petitions alleging the children were neglected. Mother did not seek medical care for Amie's injuries sustained during the accident because she fell asleep for the majority of the immediate twenty-four hours after the accident. Mother's parents took Amie to the hospital for treatment and, while at the hospital, Amie tested positive for cocaine.

The trial court granted DSS nonsecure custody of all four children on 10 August 2021 and appointed a Guardian Ad Litem for the children on 26 August 2021. The trial court entered a second nonsecure custody order on 13 September 2021 placing the children in a kinship placement with their maternal grandmother. A child planning conference was held thereafter in which the primary plan was set for reunification. As part of the reunification efforts, Mother was allowed supervised visitation and required to submit to drug testing, gain employment, participate in psychological and substance abuse evaluations, and engage with multiple other community support programs that teach parenting skills. On 24 November 2021, the

children were removed from the grandmother's home and placed in foster homes because the children's extensive needs could no longer be met there.

Following the replacement, Mother was involved in another single-car accident. Mother also tested positive for illegal substances after showing up to a drug screening appearing intoxicated. Mother's first attorney withdrew on 16 March 2022 after Mother discharged him. On 17 March 2022, law enforcement was called to the visitation center after Mother and the grandmother engaged in an altercation with social workers when the visitation ended. Visitation was suspended thereafter and was not reinstated until 5 April 2022 after the implementation of additional conditions.

Mother's second attorney withdrew on 28 April 2022 after Mother discharged her. The trial court then appointed a Guardian Ad Litem to protect Mother's interest on 23 May and another attorney on 27 May 2022.

On 19 April 2023, after a permanency planning hearing, the trial court changed the primary plan for the children to adoption with a secondary plan of reunification. DSS petitioned to have Mother's parental rights terminated on 17 May 2023, alleging neglect, dependency, and failure to make reasonable progress in remedying the initial circumstances leading to the children's removal. A few months later, on 16 August 2023, both Mother's Guardian Ad Litem and her third appointed attorney withdrew after Mother filed complaints with the North Carolina Bar Association against them for failing to immediately respond to her calls and failing

to give her the advice she wanted to hear. The trial court then appointed another Gurdian Ad Litem and another attorney for Mother.

A hearing on DSS's petition to terminate Mother's parental rights was held on 8 December 2023.[2] Over three days, the trial court received numerous reports documenting the case's history and received testimony from both psychologists who performed psychological evaluations on Mother, multiple DSS social workers, the DSS program manager for ongoing permanency planning, and Mother. On 28 March 2024, the trial court announced its ruling and terminated Mother's parental rights on dependency grounds. The trial court then held dispositional hearings on 9 and 17 May 2024. The trial court entered the final written orders terminating Mother's parental rights and addressing dependency and the children's best interest on 14 August 2024.

Mother timely appeals.

## II. Analysis

Mother contends the trial court erred by adjudicating the children dependent. Specifically, she argues the trial court's findings of fact do not support the conclusion that Mother is incapable of caring for her children and that there was not an appropriate alternative childcare arrangement. Mother also alleges the trial court

---

[2] Both of the fathers involved in the proceeding had their parental rights terminated on 1 November 2023. They are not parties to this proceeding.

abused its discretion when determining termination is in the children's best interest. We disagree.

## A. Adjudication

Mother challenges Findings of Fact 70, 71, and 72 in the termination orders as being conclusions of law and challenges Findings of Fact 131(g), 131(h), 141, 171, and 178, claiming they are contradictory or unsupported by evidence.[3] She then argues "[t]he remaining findings of fact do not support the conclusion that [Mother] is incapable of caring for the children." We disagree.

Termination of parental rights proceedings require an adjudicatory and dispositional stage. *In re S.D.C.*, 373 N.C. 285, 289, 837 S.E.2d 854, 857 (2020) (citation omitted). "'A different standard of review applies to each stage.'" *In re K.B.C.*, 295 N.C. App. 619, 626, 906 S.E.2d 840, 846 (2024) (quoting *In re D.R.B.*, 182 N.C. App. 733, 735, 643 S.E.2d 77, 79 (2007)).

During the initial adjudicatory stage, a petitioner must show that one or more grounds for termination exist under section 7B-1111(a) of the North Carolina General Statutes by clear, cogent, and convincing evidence. *In re S.D.C.*, 373 N.C. at 289, 837 S.E.2d at 857 (quoting *In re A.U.D.*, 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019)). Among these are a determination that the "parent is incapable of providing for the

---

[3] The adjudication and termination orders are substantially the same with minor semantic differences regarding each individual child. Because of this, we refer to the orders and their constituent parts in the singular throughout our analysis.

proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of [section] 7B-101, and that there is a reasonable probability that the incapability will continue for the foreseeable future." N.C. Gen. Stat. § 7B-1111(a)(6) (2023). Section 7B-101 defines a dependent juvenile as, *inter alia*, one who is "in need of assistance or placement because . . . the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9) (2023).

A parent's incapability "may be the result of substance abuse, intellectual disability, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-1111(a)(6) (2023). A trial court "'must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements.'" *In re K.B.C.*, 295 N.C. App. at 627, 906 S.E.2d at 846 (quoting *In re L.R.S.*, 237 N.C. App. 16, 19, 764 S.E.2d 908, 910 (2014)). When adjudicating a child dependent, a trial court "must consider the conditions as they exist at the time of the adjudication as well as the risk of harm to the child from return to a parent and look at the situation before the court at the time of the hearing[.]" *In re A.J.*, 386 N.C. 409, 416, 904 S.E.2d 707, 714 (2024) (citation modified).

We review a trial court's "adjudication that grounds exist to terminate parental rights 'to determine whether the findings are supported by clear, cogent, and convincing evidence and the findings support the conclusions of law.'" *In re S.M.*, 375 N.C. 673, 682, 850 S.E.2d 292, 301 (2020) (quoting *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019)). Unchallenged findings of fact "'are deemed supported by competent evidence and are binding on appeal.'" *Id.* (quoting *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019)). "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *Id.* (citation modified). "A trial court's finding of an ultimate fact is conclusive on appeal if the evidentiary facts reasonably support the trial court's ultimate finding of fact." *In re G.C.*, 384 N.C. 62, 65, 884 S.E.2d 658, 661 (2023) (citation modified). In contrast, we review the trial court's conclusions of law de novo. *In re A.A.*, 381 N.C. 325, 334, 873 S.E.2d 496, 505 (2022) (citation omitted).

Here, the findings Mother argues are conclusions of law state:

> 70. The Department of Social Services has proven by clear and convincing evidence that a ground exists to terminate [Mother's] parental rights pursuant to N.C. Gen. Stat. § 7B-1111[(a)](6).

> 71. Although CCDSS alleged other grounds, the dependency ground is the strongest ground under the circumstances and is the only ground for which the [c]ourt made findings.

> 72. Grounds exist to terminate [Mother's] parental rights under N.C. [Gen. Stat. § 7B]-1111[(a)](6) in that [Mother] is incapable of providing for the proper care and

supervision of the [child], such that the [child] is a dependent juvenile within the meaning of [N.C. Gen. Stat.] § 7B-101; there is a reasonable probability that such incapability will continue for the foreseeable future; and [Mother] lacks an appropriate alternative childcare arrangement. In support of this ultimate finding of fact, the court specifically finds as set out in this section.

These are not conclusions of law but rather the trial court's ultimate findings of fact required by our Supreme Court's precedent. *See In re K.C.T.*, 375 N.C. 592, 596, 850 S.E.2d 330, 334 (2020).

We also disagree with Mother's interpretations and challenges to Findings of Fact 131(g), 131(h), 141, 171, and 178. Those findings state:

131. [Mother] has not fully completed the following components of her family services agreement, including recommendations from her psychological evaluation:

. . .

g. Continue to test substance free in random hair and urine drug screens,

h. Identify an appropriate live-in support person to help her manage her own needs and the needs of the [children.]

. . .

141. [Mother's] typical interactions with the [children] is a strength, as she is usually responsive to their needs and able to interact well with them; however, she has exhibited extreme and erratic behaviors in front of them on several occasions. The behaviors have not been focused on the [children]; however, they have been present at times and witnessed erratic behaviors.

. . .

171. [Mother] does not have a proper childcare arrangement in that the only two people she has identified as possible support persons (her mother and her father) are not able to provide support sufficient to safely parent the [child] and the [child's] siblings.

> a. Findings made elsewhere in this order are incorporated as though fully set out here.
>
> b. [DSS] first attempted to work with the family's child protective service concerns without court involvement, working an in-home case with [Mother] living in the home of [the grandmother]. There continue to be Child Protective Services (CPS) reports and eventually, [DSS] filed a petition invoking the jurisdiction of the [c]ourt.
>
> c. At the time the initial petition was filed, [DSS] attempted to keep the children in the home with [the grandmother] as a kinship foster care provider. [Mother] moved out of the home at that time but was allowed generous supervised visitation.
>
> d. There continued to be CPS concerns for the [children's] safety and wellbeing while they were placed in the care of [the grandmother]. These concerns related most to [the grandmother's] inability to meet their heightened medical needs, both when there were emergencies and in managing their preventative care, such as managing feeding instructions and proper medication dosage. [The grandmother] also acknowledged the inability to prevent [Mother] from interfering in the care of the [children].
>
> e. The [children] were moved into licensed foster homes in November 2021.
>
> f. In 2023, [DSS] completed kinship assessments with [Mother's] parents, [the grandmother and the grandfather], but concluded neither grandparent was capable of providing appropriate parenting

IN RE: A.G., A.G., A.G., A.G.

support. Neither grandparent was approved for placement.

g. [The grandfather's] home could not be assessed and was therefore not approved, because he acknowledged the home he shares with his brother is not suitable in size for the [children]. He was unwilling to move to a larger home without an approved home study; however, [DSS] could not complete a home study without knowing if and when he would actually move to a larger home or anything about its condition.

h. Concerns were raised in [the grandmother's] home study regarding prior domestic violence by [the grandfather].

i. [The grandmother's] home study was not approved by [DSS]. While there was some discussion in the report about issues that needed to be addressed to make the home physically safe, ultimately, these concerns were not insurmountable, and the [c]ourt did not consider any of the physical concerns for safety in the home.

j. [The grandmother] was not approved as an in-home support for [Mother] as determined necessary by Dr. Matala in the first psychological/parental capacity evaluation, nor was she approved as a kinship provider apart from [Mother].

k. There were numerous concerning interactions with [the grandmother] while previously caring for the [children] and during the home study process.

l. [The grandmother] lacked an understanding of the [children's] special needs.

m. [The grandmother] had an inadequate perception of safety issues that affect the [children] as they continue to grow and develop.

n. [The grandmother] took the [DSS] social worker aside to find out how she could have [Mother] removed from her home.

o. There continued to be reports of child abuse and neglect and criminal activity in the home, requiring assessment by [DSS] and law enforcement during the pendency of the case.

p. There continued to be unrest and fighting in the home, even during the period while there were hearings on termination of parental rights.

q. [Mother] drove in the middle of the night with one of the [children], and [the grandmother] could not stop her.

r. [Mother's] return to use of substances will make it more difficult for [the grandmother] to protect the [children] from [Mother's] behavior, which can sometimes be dangerous, as her use of substances tends to increase her volatile behavior.

s. [Mother] does not recognize the risks involved with exposing the [children] to [a boyfriend] when she was in a relationship with him, and it appears that [the grandmother] is not able to keep him from showing up at the house.

t. The [children] need more than one person providing knowledgeable care and support. They need a village. This court finds that [the grandmother] is not able to provide that support for the reasons stated in open court and set forth hereinabove.

. . .

178. The significant developmental and medical needs of the [children] substantially factored in the [c]ourt's determination that the dependency ground existed. Intellectual disorders and personality disorders make it

> difficult to parent any children but especially children with
> special needs.

Despite Mother's contentions, these findings are supported by competent evidence and, in part, appropriately convey the court's reasoning for adjudicating the children dependent.

The trial court received evidence that Mother had tested positive for substances at seven out of the eleven appointments where she was ordered to take substance tests between 10 May 2023 and 17 January 2024. Of the four appointments where she did not test positive, she did not show up to three of them. As such, Finding of Fact 131(g) is supported by competent evidence. Similarly, Finding of Fact 131(h) is supported by evidence that neither Mother's mother nor father were appropriate alternatives to Mother. The children were previously under the grandmother's care but were removed from her physical custody because of safety concerns. Similarly, DSS was unable to conduct a home visit at the grandfather's house and he acknowledged his living arrangement was not conducive for housing four children. While the grandfather expressed a willingness to find different housing, a mere statement of future intent is inadequate to constitute an appropriate alternative when the trial court must look at the circumstances before it at the time of adjudication. *In re A.J.*, 386 N.C. at 416, 904 S.E.2d at 714.

Finding of Fact 141 is also supported by clear, cogent, and convincing evidence. On 17 March 2022, after concluding a scheduled visitation with the children at the

Family Visitation Center, Mother became irate when a social worker buckled one of the triplets into a car seat and began yelling expletives at the social worker until police arrived. All four children were present and became extremely distressed thereafter. Finding of Fact 178, however, simply provides part of the trial court's reasoning in adjudicating the children dependent. While the trial court received evidence that Mother did interact well with the children, additional evidence received in the form of Dr. Matala's evaluation reflected that all four children have varying needs above and beyond what are typical and, in conjunction with Mother's diagnosed conditions, contribute to a difficult familial situation which Mother is unequipped to handle without additional support.

Finding of Fact 171 contains numerous sub-findings, many of which are recitations of the procedural history in this case. The others are supported by clear, cogent, and convincing evidence. For those specific to the grandmother's aptitude as an alternative arrangement, record evidence states "[b]ased on [the grandmother's] medical problems, concerns about her escalating situations at visitations, and a problematic relationship with [Mother] in the past, [the grandmother] is not likely to be a good support person."

Further evidencing the court's findings, the trial court received testimony that DSS determined the grandmother's home was not suitable because of numerous concerns: specifically noting familial violence issues occurring during the proceedings; the grandmother's request to have Mother removed from the home; a

failure to fully appreciate the children's medical needs and concern of whether the grandmother would follow future medical advice; the provision of marijuana to a minor residing in the residence; and an inability to appropriately supervise and control Mother's risky behaviors while Mother is with the children.

In further support of this finding, numerous DSS reports indicate that the grandmother's home is extremely cluttered and not a viable option for housing the grandmother, Mother, Mother's niece, and the children. Additionally, the grandmother engaged in numerous inappropriate interactions with social workers during proceedings; even going as far as to tell one social worker—in the presence of the children—that she hoped the social worker, the social worker's parents, and the social worker's son die.

The trial court also received two psychological evaluations concerning Mother's mental and parental capacities. Each evaluation reported that Mother requires an additional support person to take care of her own needs and the children's needs. One of the evaluations found the grandmother could not serve in this capacity because of her own medical needs, "escalating situations at visitation, and a problematic relationship" between her and Mother in the past.

With respect to the findings regarding the grandfather's ability to serve as an alternative childcare provider, as stated above, a DSS social worker testified that she was unable to conduct a home study on the grandfather's home and he acknowledged it would be inadequate to house himself, his brother, and the children.

Regarding Mother's failure to recognize the risks involved with exposing her children to her then-boyfriend, evidence reflected that, despite his lengthy criminal history, including a substantiated accusation of sexual abuse of a minor, Mother did not believe he created a danger to her children and had him accompany her to visitations.

Considering the aforementioned evidence, we hold the challenged findings of fact are supported by clear, cogent, and convincing evidence. As such, they are binding on appeal. *In re J.A.M.*, 372 N.C. 1, 8, 822 S.E.2d 693, 698 (2019) ("It is well settled that in a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." (citation modified)).

Mother contends the trial court used dependency as a "catch-all termination ground[,]" and, because the trial court "failed to make findings regarding neglect and willful failure to make reasonable progress as alleged by DSS in the petition[,]" "the findings . . . do not support the conclusion of dependency[.]" We disagree as this is essentially an attack on the sufficiency of the termination petition and the trial court's findings support termination on dependency grounds. Moreover, the termination petition here specifically alleged dependency as a ground for termination.

Termination petitions do not require extensive factual allegations, but the allegations must be sufficient to "'put a party on notice as to what acts, omissions or

conditions are at issue.'" *In re D.R.J.*, 381 N.C. 381, 387, 873 S.E.2d 281, 286 (2022) (quoting *In re B.C.B.*, 374 N.C. 32, 34, 839 S.E.2d 748, 751 (2020)). The termination petition here alleged Mother "is incapable of providing for the proper care and supervision of the [children], such that the [children] [are] dependent [] within the meaning of [section] 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future." Moreover, the petition lists numerous factual circumstances adequately putting Mother on notice as to what acts, omissions, or conditions were at issue. The petition specifically pled facts about: Mother's various diagnoses impacting her parenting ability and the supporting medical evaluations; Mother's substance abuse; Mother's failure to engage with professionals who were attempting to help her build her parenting capabilities; the likelihood of these conditions continuing; and the inadequacy of an alternative childcare arrangement. As such, the petition sufficiently alleged the children were dependent.

We now review whether the findings of fact support the trial court's conclusion of law that the children were dependent. To reiterate, a dependent juvenile is one "in need of assistance or placement because . . . the juvenile's parent . . . is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative childcare arrangement." N.C. Gen. Stat. § 7B-101(9).

Here, the numerous findings the trial court made support the trial court's adjudication of dependency because Mother is unable to provide for her children's

care or supervision. At the threshold, the trial court determined in Finding of Fact 108, based on Dr. Matala's psychological evaluation, that Mother "has significant cognitive limitations that interfere with her ability to parent independently, especially given that the [children] have developmental delays and medical needs." Similarly, the trial court determined in Findings of Fact 119 and 123 that Mother has a history of substance abuse with a recent relapse and her use of marijuana in particular "likely has a more significant impact on [Mother's] functioning than it would for a neurotypical individual. [Mother] continues to use marijuana, in spite of this knowledge." These findings invoke multiple reasons for why a parent may be incapable of providing for the proper care and supervision of their children the General Assembly set forth in section 7B-1111(a)(6), which states "[i]ncapability under this subdivision may be the result of substance abuse, [or] intellectual disability[.]" N.C. Gen. Stat. § 7B-1111(a)(6) (2023).

The trial court also addressed reasons why these conditions are unlikely to abate in the foreseeable future in Findings of Fact 124, 125, 128, and 132, stating:

> 124. [Mother] has consistently struggled to work with professionals and appropriately incorporate feedback to meet the needs of the [children]. She likely has a combination of a lack of understanding of the impact of her behavior due to her intellectual disability and her distorted thinking and hostility due to her personality disorder.

> 125. [Mother's] lack of understanding and inability to incorporate feedback is particularly concerning, given the [children's] complex medical needs, which she did not even acknowledge in her interviews [during the second

evaluation].

. . .

128. [Mother] has previously participated in extensive parenting courses but continues to struggle with applying what she learned. As such, it is unlikely that additional parenting coaching would result in significant change in her parenting knowledge and ability.

. . .

132. Despite a recommendation from the original parental competency evaluation for individualized parenting instruction and a high level of parenting support for the indefinite future, [Mother] has not engaged in additional individualized parenting instruction, and she has continued to exhibit emotional dysregulation in the presence of her children and limited parental judgment during virtual family time sessions.

Collectively, these findings support the trial court's conclusion that Mother's inability to provide proper care will not be rectified in the foreseeable future as she is unable to appropriately receive and incorporate constructive feedback into her behavior. The trial court also concluded there is not an appropriate alternative in Finding of Fact 171, as discussed above.

In sum, we hold the trial court's findings of fact were supported by clear, cogent, and convincing evidence and these findings, in turn, supported the trial court's conclusion of law that the children were dependent within the meaning of section 7B-1111(a)(6). As such, we now turn to our review of the disposition stage.

**B. Disposition**

Mother argues it was not in the children's best interest for her parental rights

to be terminated and contends the trial court abused its discretion in determining otherwise.

After determining grounds for termination exists, proceedings move to the dispositional stage in which the trial court "determines whether terminating the parent's rights is in the juvenile's best interest." *S.D.C.*, 373 N.C. at 289, 837 S.E.2d at 857 (quoting N.C. Gen. Stat. § 7B-1110(a) (2017)); N.C. Gen. Stat. § 7B-1110(a) (2023) ("After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest.").

To determine whether termination is in the child or children's best interest, the trial court considers and makes written findings on the following factors that are relevant:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a)(1)–(6). We review the trial court's conclusion that

terminating parental rights is in the best interest of the child "solely for an abuse of discretion." *In re K.N.L.P.*, 380 N.C. 756, 759, 869 S.E.2d 643, 646 (2022) (citation modified). An abuse of discretion occurs "where a trial court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re L.L.*, 386 N.C. 706, 712, 909 S.E.2d 151, 156–57 (2024) (citation modified).

Here, the trial court appropriately addressed and weighed each statutory factor when determining it was in the children's best interest to terminate Mother's parental rights. The trial court referenced the children's ages and described them as "highly adoptable," thus showing it considered factors 1 and 2. The trial court also identified the current proceeding to be the only barrier to the primary plan of adoption, showing consideration of factor 3. For factor 4, the trial court concluded that "while the [children] recognize[] [Mother] and know[] her as 'Mama [Mother],' the [children do] not have a strong bond with [Mother] and would prefer not to engage in virtual visits when offered." The trial court also addressed factor 5 in stating that "[t]he quality of the relationship between the [child] and the proposed adoptive parent is good."

The court considered other factors as well, including that the triplets are placed together, and the potential adoptive parents are committed to allowing ongoing contact between them and their sister. Moreover, the court considered prior DSS involvement with Mother prior to the children's removal and Mother's failure to

engage in remedial efforts to keep the family together. The court also weighed into its analysis Mother's actions in reporting attorneys and psychologists to their respective licensing boards, as well as Mother's statement that the "only positive relationship she had with a foster parent [w]as one that had 'no such thing as boundaries[,]'" in determining that Mother "has no insight into the effect her actions have on [children]" and that Mother's "behaviors and actions will continue to be detrimental to the [children] if she continues to have parental rights."

The trial court here engaged in exemplary and exhaustive fact finding and analysis prior to determining it was in the children's best interest for Mother's parental rights to be terminated. Accordingly, we hold the trial court did not abuse its discretion in doing so and affirm the trial court's orders.

## III. Conclusion

For the aforementioned reasons, we affirm the trial court's orders terminating Mother's parental rights.

AFFIRMED.

Judges STADING and FREEMAN concur.

Report per Rule 30(e).