An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-896

Filed 20 May 2026

Alamance County, No. 25JA000004-000

IN THE MATTER OF: K.S.D.

Appeal by Respondent-father from an order entered 16 June 2025 by Judge Frederick B. Wilkins, Jr. in Alamance County District Court. Heard in the Court of Appeals 21 April 2026.

*Parent Defender Annick Lenior-Peek, by Assistant Parent Defender Benjamin J. Kull, for respondent-appellant father.*

*Jamie L. Hamlett for petitioner-appellee Alamance County Department of Social Services.*

*NC GAL Staff Counsel Michelle FormyDuval Lynch, for guardian ad litem.*

WOOD, Judge.

Respondent-father ("Father") appeals from the trial court's order adjudicating K.S.D. ("Kimberly") a neglected juvenile.[1]  Respondent-mother ("Mother") is not a party to this appeal.  Father argues the trial court erred because (1) the trial court relied on post-petition evidence in concluding there was a risk of future neglect and (2) without the post-petition evidence there was not clear and convincing evidence to support the trial court's conclusion Kimberly was neglected.  For the reasons set forth below, we affirm the trial court's adjudication of Kimberly as neglected.

## I.    Factual and Procedural Background

Kimberly was born on 30 December 2024 to Mother and Father.  This action regarding Kimberly was initiated by the filing of a juvenile petition alleging neglect on 3 January 2025.  However, the family's history with the Alamance County Department of Social Services ("DSS") began much earlier.

On 1 November 2022, Mother gave birth to Kimberly's older brother Kevin.[2]  On 3 November 2022, DSS received a report alleging neglect due to the fact both Kevin and Mother tested positive for cocaine and marijuana at his birth.  Mother reported she had five other children living with family in Connecticut but had limited support in North Carolina.  DSS began in-home services with the family.

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

[2] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

On 11 October 2023, Mother gave birth to David.[3] On 17 October 2023 DSS received another report alleging neglect as both Mother and son tested positive for cocaine and marijuana. In addition, David tested positive for benzodiazepines and opiates. During the family's stay in the hospital for David's birth there was ongoing conflict between Mother and Father causing hospital security to intervene. A Child and Family team meeting was held the same day at which Mother and Father became verbally hostile to the DSS social worker, denied substance use, and did not have an alternative plan for the children.

After the meeting, DSS filed petitions alleging both Kevin and David were neglected and dependent. A non-secure custody order was issued the same day and DSS took custody of both boys.

The petitions came on for hearing 21 February 2024. The trial court adjudicated the boys neglected and dependent and continued custody with DSS. The boys were placed in a foster home. Both parents were ordered to engage in services with DSS in order to make progress towards reunification. In pertinent part, Father was ordered to: obtain a sufficient source of income to support himself and develop a budget, provide a safe and appropriate home environment, refrain from allowing mental health or substance abuse to impact his parenting by completing a mental health and substance abuse assessment and implementing strategies, attend a

---

[3] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

domestic violence program and have a home free of domestic violence and chaos/discord, demonstrate age appropriate discipline and parenting skills, demonstrate the ability to ensure the children's medical needs are met, and provide a reasonable portion of the cost of care for the children.

A permanency planning hearing was held during the 17 July 2024 session of court. In the order filed 12 August 2024, the trial court found Mother was not making adequate progress towards reunification and Father was making some progress but continued to act in a manner inconsistent with the health and safety of the children. Father had not secured his own housing but was living at his sister's home, in hotel rooms, and sometimes in a car. He had not gained employment but was receiving social security disability  He had been purchasing diapers and wipes for the boys. The trial court further noted that on 17 February 2024, police found 1.5 grams of marijuana and .6 grams of crack cocaine in his possession during a traffic stop, and he was driving without a license. Father agreed to a plea deal and received twelve months of supervised probation.

During the hearing, the trial court noted Father had completed a mental health and substance abuse assessment and based on his responses, no immediate recommendations were given. Father was adamant he had completed everything in his case plan, but he had continued to be hostile to DSS case workers on numerous occasions. When DSS inquired about the domestic violence classes, the instructor reported Father had not been consistent with attendance and missed almost half of

the sessions. The instructor reported he was unable to observe Father utilize skills he had learned due to his poor attendance and if Father did not have an open case with DSS he would already have been released from the program. The trial court found Father had completed a four-hour on-line parenting class. The trial court continued the plan of reunification.

On 4 December 2024, the trial court conducted another permanency planning hearing. The trial court found that neither Father nor Mother was making adequate progress towards reunification. DSS reported an incident between Mother and Father on 18 September. DSS noted Mother was frequently covering bruises with makeup and Father would break her phones to control her communication. Father also raised his voice and became aggressive with DSS social workers in September. Father provided DSS with proof of an apartment and utility bills; however, the apartment was in the name of someone who had given him permission to reside there. When DSS social workers attempted to locate the parents, they were unable to establish exactly where Father and Mother were living, but it appeared they were together. Father also misled social workers about his location at various times, refused rides to drug testing, and became frustrated when the foster parent requested more diapers. The trial court changed the primary plan to adoption and made reunification the secondary plan.

After the 4 December hearing, Mother enrolled in a residential substance abuse treatment program called Cascades in Charlotte, North Carolina. During the

telephone intake Mother indicated that she currently was using marijuana and suboxone and that there was a past and present issue of domestic violence. She asked Rebecca Kefer ("Kefer"), the DSS social worker, if she could give her a ride to Charlotte. She provided Father's address as the location to pick her up on 12 December. Father attempted to call Mother on the way to the program, but her phone was off, so he called Kefer multiple times. Mother also reported she and Father had argued while she was packing and he had thrown all her shirts away.

Three days after check-in to the treatment center on 12 December, Mother tested positive for THC and cocaine. She also reported she had been with Father for four years but there had been domestic violence for the last two years.

Kefer attempted to stay in contact with Mother while she was in treatment; however, Mother rarely responded and communication with her was difficult.

Kimberly was born on 30 December 2024 by a scheduled c-section. At the time of delivery, Mother tested positive for Hepatitis C and Strep B. Kimberly's urine did not test positive for substances, but her meconium was sent for testing. It was negative for amphetamines, opiates, and oxycodone but there was not enough of the sample to test for cocaine, THC, or benzodiazepines. However, medical records indicated Kimberly was affected by maternal use of cannabis, opiates, and tobacco as Mother tested positive multiple times during pregnancy. Father was present at the birth and cut the umbilical cord. He also visited Mother several times.

Mother did not inform DSS when Kimberly was born. The boys' foster mother informed DSS on 31 December that Kimberly had been born. Kefer reached out to Mother but received no response. The care manager from Atrium Health, the hospital where Kimberly was born, reached out to DSS on 31 December with questions but could not give DSS any information as Mother instructed hospital staff that they were not allowed to release information to DSS. When Kefer contacted Father, he stated he did not know anything about the birth even though he had been present.

On 3 January 2025, DSS filed a petition alleging Kimberly was a neglected juvenile as she did not have proper care or supervision and lived in an injurious environment. DSS sought and received nonsecure custody of Kimberly.

A continued non-secure custody hearing was held on 8 January 2025. The trial court continued non-secure custody with DSS but allowed DSS to place Kimberly with Mother at the treatment facility as long as Mother complied with treatment and DSS facilitated interactions between Kimberly and Father.

On 7 May 2025, the adjudication on the neglect petition for Kimberly as well as the petition for termination of parental rights for her two older brothers came on for hearing, and the trial court heard both matters together. During adjudication the trial court heard testimony from Kefer; Vinneshia Covington, Mother's manager when she worked at Hardee's; Linette Myers ("Myers") a friend of Mother and foster mother for the boys; and Tabitha Brown ("Brown"), another DSS employee. The trial court adjudicated Kimberly to be neglected. The trial court then proceeded to

disposition. Kefer, Myers, and Brown provided additional testimony. Mother, Father, and the children's guardian *ad litem* also testified. The trial court found it was in Kimberly's best interest for DSS to maintain custody with placement to continue with Mother provided she maintained her treatment at Cascades.

The trial court filed the adjudication and disposition order on 16 June 2024. Father gave notice of appeal on 11 July 2025.

## II. Analysis

On appeal, Father contends the trial court erred because (1) the trial court relied on post-petition evidence in concluding there was a risk of future neglect and (2) without the post-petition evidence there was not clear and convincing evidence to support the trial court's conclusion that Kimberly was neglected. We disagree.

### A. Post Petition Evidence

"[R]eview at the adjudicatory stage is to determine whether there is clear, cogent, and convincing evidence in the record to support the trial court's findings of fact, and whether the findings of fact support the conclusions of law." *In re S.R.*, 384 N.C. 516, 527, 886 S.E.2d 166, 175 (2023). Further,

> if a trial court's finding of fact . . . is supported by clear, cogent, and convincing evidence, it will be deemed conclusive even if the record contains evidence that would support a contrary finding. We review whether the findings of fact support the conclusions of law, and conclusions of law are reviewed de novo.

*Id.* at 520, 886 S.E.2d at 171 (cleaned up). "[T]he purpose of the adjudication hearing is to adjudicate 'the existence or nonexistence of any of the conditions alleged in a petition.'" *In re A.B.*, 179 N.C. App. 605, 609, 635 S.E.2d 11, 15 (2006) (quoting N.C. Gen. Stat. § 7B–802). "[T]he conditions underlying determination of whether a juvenile is an abused, neglected, or dependent juvenile are fixed at the time of the filing of the petition. This inquiry focuses on the status of the child at the time the petition is filed, not the post-petition actions of a party." *In re L.N.H.*, 382 N.C. 536, 543, 879 S.E.2d 138, 144 (2022).

However, this rule is not absolute. An exception exists for evidence demonstrating a "fixed and ongoing circumstance" such as mental illness or paternity. *In re V.B.*, 239 N.C. App. 340, 344, 768 S.E.2d 867, 870 (2015). Consequently, this Court has held when the post-petition evidence relates "in whole or in part to ongoing circumstances relevant to the existence or nonexistence of conditions alleged in the adjudication petition" then it is admissible during adjudication. *In re G.W.*, 286 N.C. App. 587, 594, 882 S.E.2d 81, 88 (2022) (internal quotations and citations omitted).

In the case *sub judice,* Father contends findings of fact 25, 41, 42, 43, 44, 45 and 46 all relied on post-petition evidence.

> 25. On January 27, 2025, [Father] completed his exit interview. During the interview, he reported no problems or concerns, successfully completed quiz, stated he had been non-violent and non-abusive. [Father] stated he learned a lot. [Father] did not report kicking [Mother] out

of the shared home on December 4, 2024 or throwing her clothing away on December 12, 2024. [Father] did not report the domestic violence tendencies or control tactics observed by Hardee's employees. [Father] did not report his ongoing difficulties managing his behaviors with social work staff or arguing with the social worker in front of the children.

41. . . . [Mother] continues to engage with [Father]. . . .

42. . . . [Mother] continued to communicate with him and have him visit her in Charlotte.

43. [Mother] has facilitated [Father's] phone contact with [Kimberly] even though the court order says that [DSS] shall facilitate contact between [Kimberly] and [Father].

44. [Mother] contacts [Father] during her limited visitation with the boys.

45. It appears that [Father] continues to exercise significant control over [Mother]. She is in an environment where she could separate herself from [Father] but she has chosen not too. It is not believable that they are only coparenting when they communicate daily and he continues to financially provide for [Mother].

46. Prior to [DSS] assuming custody of Kimberly, [Father] was going to Charlotte to visit the mother. When the Department indicated all contact with Kimberly had to be supervised by the Department, [Father] reported that he could not travel to Charlotte. The Department feared for the safety of social workers due to [Father's] belligerent attitude towards social workers so the social workers would not transport [Father]. When he was seeing the mother, [Father] had no issues with getting to Charlotte. However, when the visitation was between him and the infant only, [Father] could not arrange transportation. The Court infers the father was going to see [Mother] more than to see his child.

Findings of fact 41, 42 and 45 have a basis in the circumstances on the day of the

petition and do not rely on post-petition facts although those same circumstances continued post-petition. Mother and Father had a long relationship history that Mother reported multiple times in December 2024 was violent. However, Mother "continued to engage" with Father as evidenced by the fact that she requested Kefer pick her up from Father's apartment when she left for treatment, and Father continued to call and talk to Mother. It was also clear based on medical records and Mother's testimony that Father was present for Kimberly's birth in Charlotte and was listed on Mother's visitors list for the treatment center. This provides clear, cogent and convincing pre-petition evidence sufficient to support findings of fact 41, 42, and 45.

Findings of fact 25, 43, 44, and 46 clearly relate to events, visitation situations and domestic violence classes, which occurred after Kimberly's birth on 31 December and the filing of the petition on 3 January. Because the visitation and classes were a "discrete occurrence that occur[ed] over a designated period of time" this evidence is not admissible at adjudication on the neglect petition despite its purported relevancy on the termination of parental rights petitions. *In re G.W.*, 286 N.C. App. at 596, 882 S.E.2d at 89. "[W]hen an appellate court determines that a finding of fact is not supported by sufficient evidence, the court must disregard that finding and examine whether the remaining findings of fact support the trial court's conclusions of law." *In re A.J.*, 386 N.C. 409, 410, 904 S.E.2d 707, 710 (2024). Therefore, we disregard

findings of fact 25, 43, 44, and 46 and examine whether the remaining findings support the trial court's conclusion that Kimberly is neglected.

**B. Neglect**

"When neglect cases involve newborns, the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re G.W.*, 286 N.C. App. at 592, 882 S.E.2d at 86–87 (cleaned up). "The fact of prior abuse, standing alone, is not sufficient to support an adjudication of neglect. Instead, we require the presence of other factors to suggest that the neglect or abuse will be repeated." *In re J.A.M.*, 372 N.C. 1, 9–10, 822 S.E.2d 693, 699 (2019) (cleaned up).

To that end, we look first to the trial court's remaining findings of fact. In addition to his arguments regarding post-petition findings of fact, Father also argues portions of two additional findings of fact, findings 16 and 17, are not sufficiently supported by the evidence.

Regarding finding of fact 16, Father argues the statement "[t]he results of the meconium screen are not immediately available" was unsupported. In fact, the results of the meconium screening took longer than the urine screening and were not "immediately" available at the hospital. However, testing was completed 7 January 2025 and was reflected in the medical records DSS entered into evidence. Regardless, this finding is irrelevant for the adjudication and "erroneous findings unnecessary to

the determination do not constitute reversible error." *In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006).

Finding of fact 17 states in pertinent part, "Since enrolling in the current program, SW Keffer [sic] was unable to communicate with [Mother]." We agree this statement is inaccurate. Kefer testified she had "difficulty" communicating with Mother during treatment but had communicated with her especially when it "pertain[ed] to visitation." In addition, Mother testified about her conversations with Kefer while she was in treatment. Therefore, this portion of finding 17 is unsupported and will be disregarded.

While we disregard findings of fact 25, 43, 44, 46 and parts of findings of fact 16 and 17, approximately 73 findings of fact remain unchallenged.[4] Additionally, as noted *supra* findings of fact 41, 42, and 45 were supported by competent evidence and "[a] trial court's findings of fact are binding on appeal if supported by competent evidence. Unchallenged findings of fact are also binding on appeal." *In re H.R.P.*, 297 N.C. App. 339, 344, 910 S.E.2d 738, 743 (2024) (quoting *Durham Hosiery Mill Ltd. P'ship v. Morris*, 217 N.C. App. 590, 592, 720 S.E.2d 426, 427 (2011)). A thorough review of the 76 binding findings of fact reveals "the presence of other factors" that support the trial court's conclusion of the likelihood that "neglect

---

[4] We recognize the trial court's order has multiple numbering patterns, but it appears there are 82 total findings of fact with some findings containing multiple subparts.

or abuse will be repeated." *In re J.A.M.*, 372 N.C. at 9–10, 822 S.E.2d at 699 (quoting *In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 487, 489 (2014)).

Based on the remaining findings of fact Mother and Father have a long history of domestic violence and drug abuse. Two older brothers were adjudicated neglected and dependent on 21 February 2024 based on domestic violence concerns and substance abuse as both boys were born testing positive for illicit substances. On 4 December 2024, less than a month before Kimberly's birth, the primary plan for the boys was changed to adoption and DSS was required to file a petition for termination of parental rights due to lack of progress addressing the issues of removal. Mother admitted to continuing to use drugs, including cocaine and marijuana, during her pregnancy with Kimberly and tested positive for cocaine and marijuana three days after admittance to inpatient treatment on 12 December 2024. Mother also admitted that there were domestic violence issues in the home until she left for treatment on 12 December 2024. DSS social workers testified Father was aggressive with social workers and policies had to be put in place to ensure their safety when engaging with Father. Further, Father missed approximately nineteen of his domestic violence classes causing the program to take about twice as long as it should, and he had not completed the classes at the time of the petition. Even so, Mother continued to engage with Father, placed him on her visitors list at treatment, informed him of the scheduled c-section so that he was present, and maintained phone contact with him.

At the time of the neglect petition, 3 January 2025, Mother had been barely sober for two weeks but continued to communicate and visit with Father despite a domestic violence incident having occurred just two-weeks earlier. Father had not completed his domestic violence classes after nearly a year, and DSS still had to take protective measures for social workers due to Father's behavior. Therefore, the trial court's conclusion that neglect would be repeated if Kimberly were to be placed in the custody of her parents was supported by the findings of fact which in turn was based on clear and convincing evidence in the record.

## III. Conclusion

For the foregoing reasons, we affirm the trial court's adjudication of Kimberly as neglected.

AFFIRMED.

Judges CARPENTER and STADING concur.

Report per Rule 30(e).