An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-132

Filed 15 October 2025

Iredell County, No. 24JA000106-480

IN THE MATTER OF: C.R.

Appeal by respondent-mother from orders entered 21 October 2024 by Judge Carole A. Hicks in Iredell County District Court. Heard in the Court of Appeals 30 September 2025.

*Lauren Vaughan for petitioner-appellee Iredell County Department of Social Services.*

*Brittany T. McKinney, GAL Staff Attorney for the guardian ad litem.*

*Jason R. Page for respondent-appellant mother.*

PER CURIAM.

Mother appeals from the trial court's adjudication and disposition orders adjudicating her minor child, Christy,[1] neglected and dependent. On appeal, Mother argues the trial court erred, first, in adjudicating Christy to be neglected and dependent, and second, in determining that the Iredell County Department of Social

---

[1] Pseudonyms are used to protect the juveniles' identities, pursuant to N.C.R. App. P. 42(b).

Services ("ICDSS") made reasonable efforts to prevent Christy's removal from her home. Upon careful review, we affirm the trial court's adjudication and disposition orders.

## I. **Factual and Procedural Background**

Mother's first child, Marcus,[2] was born in January 2023. The day after his birth, Rockingham County Department of Health and Human Services, Division of Social Services ("RCDSS"), received a report regarding Mother's "severe cognitive impairments that impacted [ ] [M]other's ability to safely and independently parent the child." The report alleged that, while Mother was in the hospital, Marcus went an entire night without food because she did not know how or when to feed him. Hospital staff observed that Mother did not appear to understand feeding cues. When Marcus cried, Mother appeared anxious and asked the nurses for assistance. Additionally, hospital staff had to assist Mother with her own basic needs, as she did not know how to order food as a patient and required prompting from nurses to engage in postpartum self-care.

A social worker[3] visited the hospital in response to the report. Mother told the social worker that her boyfriend, whom she had met online three months prior, planned to teach her how to care for Marcus. When asked about support from family

---

[2] Marcus is not at issue in this case.
[3] This social worker was not named in the Record.

members, Mother explained that she did not have any of their phone numbers. At that time, she was unemployed.

The social worker then visited the apartment where Mother and her boyfriend lived. The social worker noted that Mother's boyfriend also appeared to exhibit signs of cognitive delays. Although some baby supplies were present, there were no baby bottles in the home, and Marcus's bassinet contained items that posed a safety risk to a newborn. Ultimately, RCDSS filed a juvenile petition alleging Marcus was a neglected and dependent juvenile, and RCDSS received nonsecure custody of Marcus.

On 7 February 2023, Mother completed a psychological evaluation. The assessment results indicated that Mother's overall intellectual ability fell below the 1st percentile, suggesting a "limited ability to care for herself independently" and "significant challenges in her ability to independently meet the needs of an infant." The evaluation also concluded that she was unlikely to benefit from standard parenting classes.

Approximately one month later, the trial court adjudicated Marcus as a neglected and dependent juvenile. The case was transferred from Rockingham County to Mecklenburg County in May 2023 following Mother's relocation. Coretta Pellom, a social worker from Mecklenburg County, was assigned to Marcus's case.

On 31 October 2023, Mother completed a clinical assessment at Daymark Recovery Services. Based on the assessment, she was diagnosed with unspecified trauma and stressor-related disorder. It was recommended that Mother engage in

weekly individual therapy and attend a ten-day stay at a facility providing twenty-four-hour crisis-based services.

Mother participated in the recommended inpatient treatment at Daymark's crisis facility from 1 November to 13 November 2023. During her stay, she met Tracey Brandon, an employee at the facility. Mother and Ms. Brandon became friends, and following Mother's discharge, Ms. Brandon allowed her to move into her home. As a result, Ms. Brandon was terminated from her employment at Daymark.

Mother gave birth to her second child, Christy, on 31 May 2024 while living with Ms. Brandon in Iredell County. Shortly thereafter, ICDSS received a report raising concerns due to the ongoing matter involving Marcus in Mecklenburg County. Georjeana Moreland, a social worker with ICDSS, visited Mother in the hospital following Christy's birth. Ms. Moreland described Mother as "cooperative" and "fairly pleasant," but stated that she did not observe Mother directly caring for the infant during the visit.

Ms. Moreland subsequently spoke with Ms. Pellom, who expressed concerns regarding Mother's ability to care for an infant. Ms. Moreland also learned that a petition to terminate Mother's parental rights in Marcus's case was pending in Mecklenburg County. Based on the concerns raised by Ms. Pellom, ICDSS filed a juvenile petition on 4 June 2024, alleging that Christy was a neglected and dependent juvenile. On the same day, ICDSS was granted nonsecure custody of Christy.

On 5 June 2024, the trial court held a hearing to determine the need for continued nonsecure custody. The trial court ordered that Christy remain in ICDSS custody and appointed a Rule 17 Guardian ad Litem to represent Mother.[4] After observing Mother during the hearing, the trial court made the following additional findings: Mother had difficulty understanding basic instructions, such as standing and raising her hand; struggled to understand legal questions, including the process of obtaining counsel; and struggled to manage her emotions.

On 10 September 2024, the trial court held a hearing on the juvenile petition. At the hearing, Ms. Moreland testified, describing her visit with Mother at the hospital, her conversation with Ms. Pellom, and the home visit she conducted after Mother's release from the hospital. Ms. Moreland stated that Mother's home was "[c]lean" and "fully equipped with baby items." She also testified that her roommate, Ms. Brandon, was considered as a potential placement provider; however, that placement was ultimately deemed inappropriate because ICDSS had recently closed a case involving Ms. Brandon and her own child.

Ms. Pellom testified next. She addressed Mother's case plan progress in Marcus's case following its transfer to Mecklenburg County. Ms. Pellom expressed concerns about Mother's weekly visits with Marcus, explaining that Mother required

---

[4] The trial court may appoint a Rule 17 Guardian ad Litem "for a parent who is incompetent in accordance with [N.C.G.S.] 1A-1, Rule 17." N.C.G.S. § 7B-1101.1(c) (2023).

"one-on-one guidance," needed to be prompted to change his diaper, and must be reminded that infants drink milk rather than eat solid food. Ms. Pellom further testified that Mother had not made progress on her case plan. Although Mother completed a parenting class, it was intended for parents of toddlers and was therefore not relevant to Mother's situation. Additionally, Ms. Pellom determined that placement with Ms. Brandon was inappropriate. She raised concerns about the circumstances under which she and Mother met and specifically noted that Ms. Brandon did not allow Mother to go to the hospital when she was in labor with Christy.

At the hearing, the trial court admitted the following exhibits into evidence: Mother's psychological evaluation on 7 February 2023; the clinical assessment from Daymark on 31 October 2023; medical records from her stay at Daymark from 1 November 2023 to 13 November 2023; and the adjudication and disposition orders entered on 29 March 2023 in Marcus's case in Rockingham County. The trial court additionally took judicial notice of two permanency planning orders entered in Marcus's case in Mecklenburg County following hearings held in July and November 2023.

Ultimately, the trial court adjudicated Christy neglected and dependent. Following a disposition hearing, the trial court ordered that Christy remain in the custody of ICDSS. The trial court entered written adjudication and disposition orders on 21 October 2024. On 20 November 2024, Mother timely filed notice of appeal. On

7 March 2025, Mother filed a Petition for Writ of Certiorari ("PWC") seeking this Court's review, acknowledging that her notice of appeal was defective due to Mother's lack of signature.

## II. <u>Jurisdiction</u>

As a preliminary matter, we address Mother's defective notice of appeal. Pursuant to Appellate Rule 3(b) and N.C.G.S. § 7B-1001(c), the notice of appeal must be "signed by both the appealing party and counsel for the appealing party." N.C.R. App. P. 3(b); N.C.G.S. § 7B-1001(c) (2023). In the present case, Mother's counsel and her Rule 17 Guardian ad Litem signed the 20 November 2024 notice of appeal; however, it was not signed by Mother. *See In re Z.A.N.L.W.C.*, 297 N.C. App. 698, 703 (2025) (Respondent-mother's Rule 17 Guardian ad Litem "was not a proper party to file notice of appeal . . . Mother was therefore required to sign the notice of appeal"). Moreover, it is well-established that Rule 3 is "jurisdictional, and if not complied with, the appeal must be dismissed." *In re L.B.*, 187 N.C. App. 326, 332 (2007). Thus, because Mother did not sign the notice of appeal, we must dismiss the appeal unless we grant Mother's PWC.

Under Rule 21 of our Rules of Appellate Procedure, a "[PWC] may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action[.]" N.C.R. App. P. 21(a)(1). In our discretion, we grant Mother's PWC and address the merits of her appeal. *See In re A.S.*, 190

N.C. App. 679, 683 (2008) (considering the "serious consequences" associated with an initial adjudication of neglect when granting respondent's PWC).

### III. <u>Standard of Review</u>

This Court reviews a trial court's adjudication of abuse, neglect, or dependency to determine "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact[.]" *In re S.C.R.*, 217 N.C. App. 166, 168 (2011) (internal quotations and citations omitted). "The trial court's conclusions of law are reviewable *de novo*" on appeal. *In re H.P.*, 278 N.C. App. 195, 201 (2021). Findings of fact that are not challenged on appeal are deemed binding and conclusive. *In re V.B.*, 239 N.C. App. 340, 341 (2015). Moreover, findings of fact supported by clear and convincing evidence are considered conclusive, even if the record contains evidence to the contrary. *In re H.P.*, 278 N.C. App. at 201.

Following an adjudication of abuse, neglect, or dependency, the trial court proceeds to the dispositional phase where the court may consider any evidence that it considers to be "relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C.G.S. § 7B-901(a) (2023). "The district court has broad discretion to fashion a disposition from the prescribed alternatives . . . based upon the best interests of the child. We review a disposition order only for an abuse of discretion." *In re K.H.*, 281 N.C. App. 259, 270 (2022) (internal citation and quotation marks omitted). Thus, "a trial court's discretionary

ruling is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *In re S.H.*, 217 N.C. App. 140, 144 (2011) (citation and internal quotation marks omitted).

## IV. <u>Analysis</u>

On appeal, Mother argues the trial court erred by: (A) concluding that Christy was neglected and dependent, and (B) determining ICDSS made reasonable efforts to prevent Christy's placement with ICDSS. We address each argument, in turn.

### A. Adjudication

Mother first argues the trial court erred in concluding that Christy was neglected and dependent because the evidence presented at the hearing primarily concerned the prior case involving Marcus, which arose under different circumstances, and she is capable of providing appropriate care for Christy.

### 1. Challenged Findings of Fact

Mother challenges numerous adjudicatory findings as improper findings or unsupported by clear, cogent, and convincing evidence. Mother first contends that portions of Findings of Fact 7, 9, 10, 15, 16, and 17 merely recite witness testimony rather than reflect the trial court's independent findings and therefore do not constitute proper findings of fact.[5]

---

[5] Although Mother's brief states that she is challenging Finding of Fact 8, the specific language she contests appears in Finding of Fact 9. Accordingly, we consider finding of fact 8 to be binding and limit our review to the challenged portion of Finding of Fact 9.

Our Supreme Court has established that "[r]ecitations of the testimony of each witness *do not* constitute *findings of fact* by the trial judge." *In re A.C.*, 378 N.C. 377, 383 (2021) (citations omitted); *see also In re Bullock*, 229 N.C. App. 373, 379 (2013) ("The trial court must weigh all of the evidence and in its findings, resolve the conflicts raised, as recitations of the testimony of each witness *do not* constitute *findings of fact* by the trial judge." (citation modified)).  Nevertheless, a finding that recites witness testimony may still be treated as a proper finding of fact if "it also includes 'an indication concerning whether the trial court deemed the relevant portion of the testimony credible.'" *In re H.B.*, 384 N.C. 484, 490 (2023) (citation omitted).  This is because it is "the trial court's obligation to evaluate the credibility of the witnesses who testified at the adjudication hearing and to resolve any contradictions that existed in the evidence." *In re A.C.*, 378 N.C. at 384.  Likewise, the trial court may describe witness testimony in a factual finding, "so long as the court ultimately makes its own findings, resolving any material disputes[.]" *In re A.E.*, 379 N.C. 177, 185 (2021) (citations omitted).

With this in mind, we now examine the challenged language in each disputed finding of fact. Mother first challenges the portion of Finding of Fact 7, which states "[Marcus] was born in January 2023, [and] it was reported [Mother] did not know how to provide basic care for the minor child, such as diaper changing and proper feeding." This finding is not a recitation of testimony, however, but rather a finding regarding the background of how social services first became involved with Mother,

and it is supported by the evidence. During the hearing, the adjudication order entered in Marcus's case on 29 March 2023 was admitted into evidence. In that adjudication order, the trial court found that shortly after Marcus's birth, RCDSS received a neglect report alleging improper care due to concerns that Mother "presented with severe cognitive impairments that impacted the mother's ability to safely and independently parent the child." The trial court also found that the report indicated Mother did not know how and when to feed the child or what to do when the child cried. Therefore, we hold this finding is a proper finding of fact and is supported by the evidence. *See In re H.P.*, 278 N.C. App. at 201.

Mother next challenges as a recitation of testimony the portion of Finding of Fact 9 which states, in relevant part, "Ms. Pellom testified before this Court regarding Mecklenburg County Department of Social Service[s'] continuing concerns with [] Mother." This finding, however, is not a recitation of testimony as the finding does not recite any actual testimony of Ms. Pellom. Rather, it is a finding by the trial court of the subject matter to which Ms. Pellom testified and appears to serve as an introduction to the findings immediately following it, which discuss the specific continuing concerns. Moreover, the finding is supported as Ms. Pellom did testify at the hearing to Mecklenburg County's continuing concerns regarding Mother's ability to provide proper care.

Mother also challenges the following portions of Findings of Fact 10, 15, 16, and 17 as mere recitations of testimony:

10. . . . Social Worker Pellom testified that [] Mother completed a parenting [class], however, the class was for toddler parenting instead of infant parenting. . . .

. . . .

15. . . . Social Worker Pellom testified the [] Mother continues to need assistance in her supervised visitations with the minor child [Marcus]. Social Worker Pellom testified that she had not observed [] Mother's interaction with the minor child [Christy].

16. Social Worker Pellom testified that she informed the Iredell County Department of Social Services of the [] Mother's imminent delivery of minor child [Christy].

17. Iredell County Social Worker Georjeana Moreland testified that Iredell County's petition in this matter dated June 3, 2024, was based primarily on concerns stemming from the [] Mother's open CPS case with Mecklenburg County. Ms. Moreland testified that during her investigation she met with the [] Mother briefly at the hospital following [Christy]'s birth. . . .

Unlike Findings of Fact 7 and 9, these findings do "merely recite[ ] the testimony of various witnesses rather than indicating what actually happened[.]" *In re J.D.O.*, 381 N.C. 799, 809 (2022) (internal quotation marks and citation omitted). Each finding reiterates the testimony of Ms. Pellom or Ms. Moreland, and the trial court made no indication regarding the credibility of either witness. Thus, we disregard these portions of the findings and proceed to Mother's remaining challenges to the adjudication order. *See id.* at 810–813 (holding that findings which merely recite witness testimony, particularly those introduced by words "testified" or "state[d]" are not proper findings of fact and must be disregarded when reviewing an

adjudication order).

Mother next challenges Finding of Fact 10 as unsupported by the evidence, which, excluding the disregarded language from above, states as follows:

> Mother had not made progress on her case plan through Mecklenburg County. . . . The [] Mother's current residence meets minimal standards; however, the home has not been deemed appropriate due to aforementioned concerns regarding Ms. Brandon.

Mother contends that this finding is unsupported, arguing that she had made progress with housing, had the supplies necessary to care for a child, and consistently attended visits with Marcus. Contrary to Mother's argument, this finding is supported by the evidence. Ms. Pellom testified that Mother had not made progress on her case plan in Mecklenburg County, and that a petition to terminate her parental rights was pending in Marcus's case. While Mother did obtain housing and had the necessary supplies, both Ms. Moreland and Ms. Pellom testified that the housing was considered inappropriate due to concerns regarding Ms. Brandon. Additionally, although Mother attended visits with Marcus, unchallenged Finding of Fact 15 states that she had not received unsupervised visits with Marcus. Thus, Mother had not made sufficient progress on her case plan to move beyond supervised visits. Indeed, Ms. Pellom testified that Mother required "one-on-one guidance" during visits, needed instruction on meeting an infant's basic needs, and did not make progress on her mental health treatment. Thus, Finding of Fact 10 is supported by clear and convincing evidence. *See In re H.P.*, 278 N.C. App. at 201.

Mother also raises issue with Finding of Fact 10 because the order contains no "aforementioned" concerns regarding Ms. Brandon. This appears to be a harmless typographical error, however, as the order contains numerous findings of fact *after* this finding identifying the concerns for Ms. Brandon as a caretaker. *See In re J.K.P.*, 238 N.C. App. 334, 343 (2014) (explaining that typographical errors are "mistakes in writing or copying something into the record, or other, similar mistakes that are *not changes in the court's reasoning* or determination" (emphasis added)). Therefore, Mother has suffered no harm as a result of this typographical error, and we overrule her challenge.

Mother next challenges the portion of Finding of Fact 14, which states, "Mother has not followed through with any mental health treatment during the pendency of her CPS case in Mecklenburg County." Mother contends that this finding is unsupported, noting that her Daymark records from November 2023, which were admitted into evidence, demonstrate that she participated in mental health treatment during the pendency of Marcus's case. Unchallenged Finding of Fact 13 states, however, that Mother's treatment plan recommended weekly individual and group therapy following her stay at Daymark. When asked about Mother's compliance with this recommendation, Ms. Pellom testified that Mother had not made progress on her mental health during Marcus's case. Ms. Pellom also noted that Mother frequently relocated within North Carolina, which made it difficult to connect her with services and establish care. Thus, although Mother completed a

- 14 -

ten-day stay with Daymark, she did not follow through with the recommended weekly therapy and had not made sufficient progress in addressing her mental health. Accordingly, we disregard this finding to the extent it may indicate she did not participate in *any* treatment, but otherwise find it supported. *See In re H.P.*, 278 N.C. App. at 201.

Mother next challenges Finding of Fact 18, which states:

> [Mother] has significant cognitive defects which hinder her ability to provide necessary care for the minor child [Christy]. These cognitive delays have been present throughout the pendency of the case involving the minor child [Marcus] and continue to be present, regarding the minor child [Christy]. [] Mother is unable to provide an appropriate alternative arrangement for the care of the minor child.

Mother argues that this finding is unsupported, asserting that there were no medical reports of concern from the hospital where Christy was born. She also notes that Ms. Moreland testified she was uncertain whether Mother was capable of caring for Christy. Additionally, Mother argues that she made alternative care arrangements by offering Ms. Brandon and her preacher as potential caretakers for Christy. Unchallenged Finding of Fact 11, however, addresses Mother's psychological evaluation from February 2023, which concluded that "Mother was found to be less than the 1st percentile in overall intellectual ability with significant challenges in her ability to meet the needs of an infant." It further concluded that, "it would be unlikely [that] Respondent Mother would benefit from standard parenting classes."

The concerns regarding Mother's cognitive abilities persisted, as Ms. Pellom testified that Mother had not made progress on her case plan and continued to require assistance during visits with Marcus. Although Ms. Moreland did not personally observe Mother's ability to care for Christy, the unresolved concerns from Marcus's case remained. Lastly, Mother correctly notes that she identified Ms. Brandon and her preacher as potential alternative placement options. But Ms. Moreland testified that Mother was unable to provide the preacher's name, and, as discussed more below, Ms. Brandon was determined to be an inappropriate placement. Thus, while Mother provided possible alternative childcare providers, she did not provide *appropriate* alternative arrangements for the care of Christy.

Mother next challenges Finding of Fact 19, which states:

> Ms. [] Brandon is not an appropriate placement for the minor child. Ms. Brandon has never been approved as an appropriate placement for the minor child [Marcus] in the Mecklenburg County case. This inappropriateness continues in the matter of [Christy].

Mother contends this finding is unsupported, pointing to Ms. Moreland's testimony that Mother's home was appropriate. She further argues that Ms. Pellom's concern regarding Ms. Brandon preventing Mother from going to the hospital while in labor is no longer relevant to Christy's case. Mother is correct that Ms. Moreland described the home shared by Mother and Ms. Brandon as "[c]lean" and "fully equipped with baby items"; however, Finding of Fact 19 does not address the physical condition of the home; rather, it addresses the ongoing concerns regarding Ms.

Brandon as a caretaker and her presence in the home. Further, substantial evidence presented at the hearing supports Finding of Fact 19. Both Ms. Moreland and Ms. Pellom testified that ICDSS had recently closed a case involving Ms. Brandon and her own child. Additional concerns were raised about the nature of Ms. Brandon's relationship with Mother, specifically that Ms. Brandon allowed Mother to move in after her discharge from Daymark and was subsequently terminated from her employment as a result. Furthermore, while the concern that Ms. Brandon prevented Mother from going to the hospital may not be a persisting concern, it nonetheless reflects issues with Ms. Brandon's judgment and her ability to safely support Mother, and, potentially, Christy.

Mother lastly challenges Finding of Fact 20, which states:

> Ms. Brandon has failed to show appropriate behavior with the Department in that she is uncooperative and argumentative. In her testimony, Ms. Brandon denied that the [] Mother was unable to properly care for the minor child due to her severe cognitive disabilities. Further, Ms. Brandon has recent CPS history regarding her own biological child.

Mother argues this finding "is not supported by any evidence, much less clear and convincing evidence[,]" noting that Ms. Brandon did not testify during the adjudication hearing. We agree with Mother that this finding is partially unsupported, as the trial court relied on evidence presented at the dispositional hearing rather than the adjudicatory hearing. *See In re Z.J.W.*, 376 N.C. 760, 773 (2021) ("[A] trial court should not consider testimony received at the dispositional

phase of a termination proceeding in making adjudicatory findings of fact[.]" (citation omitted)). Therefore, the portions of the finding concerning Ms. Brandon's interactions with ICDSS and her opinion regarding Mother's ability to care for Christy are disregarded. As discussed *supra*, however, there was other evidence at the adjudicatory stage that Ms. Brandon had a prior history with ICDSS and that portion of the finding is upheld. *See In re H.P.*, 278 N.C. App. at 201.

**2. Neglect**

Next, Mother challenges the trial court's conclusion that Christy was a neglected juvenile. She argues that the petition relied solely on the prior case involving her other child, Marcus, and did not reflect her current circumstances. In support, Mother emphasizes that she had obtained stable housing, secured necessary supplies to care for a child, received support from church members willing to assist with Christy, maintained employment at Wal-Mart immediately prior to Christy's birth, and was actively participating in therapy. Given these circumstances, Mother contends there was no evidence that Christy was at risk of physical, mental, or emotional impairment.

A neglected juvenile is defined in pertinent part as one whose parent "does not provide proper care, supervision, or discipline" or "creates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. §§ 7B-101(15)(a), (e) (2023). "To adjudicate a juvenile neglected, some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a

consequence of the failure to provide proper care, supervision, or discipline is required." *In re R.B.*, 280 N.C. App. 424, 432 (2021) (citation and internal quotation marks omitted). "A court need not wait for actual harm to occur to the child if there is a substantial risk of harm." *In re J.N.J.*, 286 N.C. App. 599, 613 (2022) (citation and quotation marks omitted). In cases involving newborns, "the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect based on the historical facts of the case." *In re J.N.J.*, 286 N.C. App. at 612 (citation omitted).

"In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C.G.S. § 7B-101(15). The trial judge is afforded "some discretion in determining the weight to be given" to a prior adjudication of neglect involving that parent. *In re J.A.M.*, 372 N.C. 1, 9 (2019). We have held, however, that

> [t]he prior adjudication of a sibling as neglected may not, standing alone, support an adjudication of neglect. Instead, additional factors must be present to suggest that the neglect . . . will be repeated. A parent's failure to correct the conditions that lead to the prior adjudication of neglect . . . may support the likelihood of the repetition of neglect.

*In re J.N.J.*, 286 N.C. App. at 613 (internal citations and quotation marks omitted).

This Court addressed a similar issue in *In re E.N.S.* 164 N.C. App. 146, 149 (2004). In that case, the juvenile, E.S., was removed from the respondent's care

immediately after birth, before the respondent had been discharged from the hospital. The trial court adjudicated E.S. as neglected based on events that occurred prior to his birth, specifically, the prior adjudication of the respondent's oldest child as neglected and dependent approximately two years earlier. *Id.* at 150. Additionally, following the adjudication of the respondent's oldest child and before E.S.'s birth, the respondent "continued to demonstrate behavior that evidenced she would neglect E.S." *Id.* Moreover, the respondent's circumstances had not improved after E.S.'s birth. *Id.* On appeal, this Court upheld the adjudication, concluding that the trial court appropriately considered both the prior adjudication and the likelihood that neglect would continue in the future. *Id.* at 151.

The present case is akin to *In re E.N.S.* Marcus was born in January 2023 and adjudicated neglected because Mother was unable to provide him with basic care due primarily to her cognitive delays. During the pendency of Marcus's case, Mother failed to make progress on her case plan. Specifically, she did not engage in mental health treatment and had not received unsupervised visits with Marcus. A petition to terminate Mother's parental rights to Marcus was pending as of the hearing date in the present case. Mother's cognitive impairments significantly limited her ability to meet Marcus's basic needs and remained unchanged at the time of Christy's birth. Furthermore, Mother's living arrangement was inappropriate, as Ms. Brandon was not a proper placement, and Mother was unable to identify an appropriate alternative placement for Christy.

Accordingly, the trial court properly considered both the prior adjudication of neglect in Marcus's case and the continuing circumstances that led to that adjudication in evaluating the likelihood of continued neglect in Christy's case. *See id.* at 151; *In re J.A.M.*, 372 N.C. at 9. The same concerns that were present in Marcus's case, particularly Mother's cognitive impairments and inability to provide appropriate care, were still present at the time of Christy's birth. These unaddressed concerns demonstrate that there was a substantial risk of future neglect. *See In re J.N.J.*, 286 N.C. App. at 612. Taken together, the trial court's findings are sufficient to support its determination that Christy is a neglected juvenile. *See In re S.C.R.*, 217 N.C. App. at 168.

### 3. Dependency

Mother also argues that the trial court erred in concluding that Christy is a dependent juvenile. A dependent juvenile is one "in need of assistance or placement because . . . the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C.G.S. § 7B-101(9). Therefore, "the trial court must address *both* (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative childcare arrangements." *In re D.S.*, 286 N.C. App. 1, 20 (2022) (citation omitted).

Here, the trial court properly considered both Mother's ability to provide care and the availability of alternative child care arrangements. The trial court found

that Mother "has significant cognitive defects which hinder her ability to provide necessary care" for Christy. As discussed *supra*, the trial court made numerous findings concerning Mother's inability to provide appropriate care for an infant. Additionally, the trial court found that Mother "is unable to provide an appropriate alternative arrangement for the care of" Christy. Regarding Ms. Brandon, the trial court determined that she was not an appropriate placement and had not been approved as such in Marcus's case. Additionally, Mother could not provide Ms. Moreland with the name of the preacher. These findings satisfy both prongs of the definition of a dependent juvenile under N.C.G.S. § 7B-101(9). Accordingly, the trial court's conclusion that Christy is a dependent juvenile is affirmed. *See In re S.C.R.*, 217 N.C. App. at 168.

For these reasons discussed above, we affirm the trial court's determination that Christy is a neglected and dependent juvenile.

## B. Reasonable Efforts

Mother additionally argues ICDSS did not make reasonable efforts to prevent Christy's removal from her home. Specifically, Mother challenges as unsupported Finding of Fact 23 in the adjudication order, which finds that ICDSS made reasonable efforts to prevent Christy's removal and that it would be contrary to her best interests to return home. Mother also challenges Conclusion of Law 2 in the disposition order, which concludes that "[IC]DSS has made reasonable efforts to prevent the need for placement of the juvenile outside the juvenile's own home."

While Mother challenges both the adjudication and disposition orders on this issue, Mother has not cited any law requiring the trial court to make a finding regarding reasonable efforts in its adjudication order. "It is not the job of this Court to create an appeal for [the appellant, or] to supplement an appellant's brief with legal authority or arguments not contained therein." *Jonna v. Yaramada*, 273 N.C. App. 93, 104 (2020) (brackets omitted). Mother has not argued how any alleged error in Finding of Fact 23 would invalidate the trial court's adjudication of Christy as neglected or dependent. As a result, Mother's challenge to the adjudication order based on ICDSS making reasonable efforts is overruled. *See id.* at 104.

As for Mother's challenge of this in the disposition order, under N.C.G.S. § 7B-903(a3), the trial court's dispositional order placing the juvenile in out-of-home care must "contain specific findings as to whether the department has made reasonable efforts to prevent the need for placement of the juvenile." N.C.G.S. § 7B-903(a3) (2023). "Reasonable efforts" is defined as "[t]he diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time." N.C.G.S. § 7B-101(18). When assessing whether efforts were reasonable, "the juvenile's health and safety shall be the paramount concern." N.C.G.S. § 7B-903(a3).

While Mother challenges the conclusion in the dispositional order that ICDSS made reasonable efforts, she does not challenge any of the dispositional findings.

Notably, Finding of Fact 7 in the dispositional order states that ICDSS made reasonable efforts to prevent the need for Chirsty's placement. Because Mother did not challenge this finding, it is binding for purposes of this appeal. *See In re V.B.,* 239 N.C. App. at 341 ("Unchallenged findings are binding on appeal." (citation omitted)). This unchallenged finding, in turn, supports the conclusion concerning ICDSS's efforts. *See In re S.C.R.*, 217 N.C. App. at 168.

Even if Mother had properly challenged the finding, we conclude the finding is sufficiently supported by the evidence. In this case, each of the trial court's orders, including the initial order for nonsecure custody, include specific findings that ICDSS made reasonable efforts to prevent or eliminate the need for placement. In the trial court's initial nonsecure custody order, it found that "Mother was unable to identify any other appropriate caretakers or make an appropriate plan for the minor child." In a subsequent order on the need for continued nonsecure custody, the trial court found that ICDSS had interviewed and gathered information from hospital staff, Mecklenburg County Department of Social Services, Mother, and other collateral sources. The trial court also found that ICDSS had made efforts to identify and locate the putative father. In the next nonsecure custody order, the trial court noted that ICDSS had conducted an assessment of Mother's home. In the following order, the trial court found that ICDSS had interviewed both Mother and Ms. Brandon, visited their residence, and performed background checks.

Additionally, at the dispositional hearing, social worker Madeline Mulkey

testified that Mother began a parenting program in August 2024 and had started therapy. Ms. Mulkey also testified she visited Mother's home the week prior to the dispositional hearing and had set up paternity testing for the putative father.

This evidence supports the finding that ICDSS made reasonable efforts to prevent the need for Christy's placement outside of the home. The trial court appropriately balanced those efforts with Christy's health and safety as the paramount concern, as required by N.C.G.S. § 7B-903(a3). The trial court found that Christy's removal was necessitated by "Mother's inability to provide basic care to the minor child due to significant cognitive delay" and the overall "instability" of Mother. The evidence shows ICDSS explored numerous alternative placement options for Christy with consideration of her best interests. ICDSS also assessed Mother's home, reviewed Mother's mental health records, interviewed both Mother and Ms. Brandon, and conducted background checks. Additionally, ICDSS continued to connect Mother with mental health and parenting resources through referrals.

Given the circumstances surrounding Christy's removal and the statutory requirement to prioritize the juvenile's health and safety, the trial court did not err in finding and concluding that ICDSS's efforts were reasonable. Accordingly, the dispositional order is affirmed. *See In re S.C.R.*, 217 N.C. App. at 168.

## V. Conclusion

Upon review, we affirm the trial court's adjudication of Christy to be neglected and dependent, and its determination that ICDSS made reasonable efforts to prevent

Christy's removal from Mother's home.

AFFIRMED.

Panel consisting of Chief Judge DILLON and Judges FLOOD and MURRY.

Report per Rule 30(e).